Christopher H. McGrath (CA 149129)
chrismcgrath@paulhastings.com
PAUL HASTINGS LLP
4747 Executive Drive, 12th Floor
San Diego, CA 92121
Telephone: 858-458-3000

*Additional counsel listed on signature page*

Attorneys for Plaintiff
Viking Therapeutics, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO DIVISION

| | |
|---|---|
| Viking Therapeutics, Inc. | CASE NO. **'22 CV 2062 BEN WVG** |
| Plaintiff, | **COMPLAINT** |
| vs. | 1. Violation of Defend Trade Secrets Act |
| Ascletis Bioscience Co., Ltd., Gannex Pharma Co., Ltd., Ascletis Pharmaceuticals Co., Ltd., Ascletis Pharma Inc., Jinzi Jason Wu | 2. Violation of California Uniform Trade Secrets Act 3. Breach of Contract 4. Breach of Implied Covenant of Good Faith and Fair Dealing 5. Tortious Interference with Contract |
| Defendants. | JURY TRIAL DEMANDED |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Viking Therapeutics, Inc. ("Viking") brings this action against Ascletis

2  Pharma Inc. ("Ascletis Pharma"), Ascletis BioScience Co., Ltd. ("Ascletis

3  BioScience"), Gannex Pharma Co., Ltd. ("Gannex Pharma"), Ascletis

4  Pharmaceuticals Co., Ltd. ("Ascletis Pharmaceuticals"), and Jinzi Jason Wu ("Jason

5  Wu") for violations of the Defend Trade Secrets Act, violations of the California

6  Uniform Trade Secrets Act, breach of contract, breach of the implied covenant of

7  good faith and fair dealing, and tortious interference with contract.

8                        **SUMMARY OF THE ACTION**

9    1.    Viking is a small biopharmaceutical company focused on the

10  development of therapies for the treatment of metabolic and endocrine disorders.

11    2.    Viking's leading clinical drug candidate, VK2809, is a selective

12  thyroid hormone receptor-beta (TRβ) agonist designed for the treatment of

13  metabolic disorders, including high cholesterol, non-alcoholic fatty liver disease

14  ("NAFLD") and non-alcoholic steatohepatitis ("NASH").  VK2809 is Viking's

15  leading drug candidate and is currently in Phase 2 clinical trials in the United

16  States.

17    3.    In 2016, Ascletis BioScience Co., Ltd. ("Ascletis BioScience")

18  requested to meet Viking at the 2016 BIO International Convention in San

19  Francisco, California, about a potential business opportunity regarding VK2809.

20    4.    To facilitate the potential collaboration, Ascletis BioScience and

21  Viking entered into a Confidential Disclosure Agreement ("2016 CDA").  The 2016

22  CDA required Ascletis BioScience to maintain any confidential information it

23  received from Viking in strict confidence and not to use Viking's trade secrets for

24  any purpose other than evaluating a possible business opportunity or transaction of

25  mutual interest with Viking, among other restrictions.  After Ascletis BioScience

26  agreed to these restrictions, Viking shared with Ascletis BioScience Viking's

27  confidential and trade secret information about VK2809.

28

5.      Viking and Ascletis BioScience did not move forward regarding VK2809 in 2016.

6.      In 2019, Ascletis BioScience again approached Viking regarding a potential business opportunity regarding VK2809.  To facilitate the potential business opportunity, Ascletis BioScience and Viking once again entered into a CDA that permitted Ascletis BioScience to review and access over a decade's worth of highly proprietary trade secrets about VK2809 ("2019 CDA").  By its terms, the 2019 CDA superseded the 2016 CDA.  Like in 2016, under the 2019 CDA, Ascletis BioScience's access to this trade secret information was conditioned on its agreement to maintain those secrets in strict confidence and not use those secrets for any reason other than evaluating the potential business opportunity, among other restrictions.

7.      After Ascletis BioScience agreed to these restrictions in the 2019 CDA, Viking shared with Ascletis BioScience, via a secure data room, its valuable trade secret information concerning VK2809.

8.      Jason Wu, the founder and CEO of Ascletis BioScience, along with several others (presumably employed by Ascletis BioScience or its agents/alter egos), then accessed Viking's secure data room under the 2019 CDA and thereby viewed the Viking Trade Secrets concerning VK2809.

9.      After reviewing the Viking Trade Secrets for over a month, Ascletis BioScience suddenly reversed course, claiming that it did not want a business collaboration with Viking.  Viking later discovered that the potential business collaboration that Ascletis BioScience proposed was actually a ruse to steal Viking's VK2809 trade secrets, circumvent years of research and development, and release its own drug product to compete with Viking's VK2809.

10.      Approximately six months after Ascletis BioScience accessed VK2809 trade secrets for the second time, and five months after it decided not to collaborate with Viking, Jason Wu—unbeknownst to Viking—founded Gannex Pharma, which

he directed to research, develop, and commercialize a drug to treat NASH in direct competition to Viking's VK2809.  Viking later learned that Gannex Pharma is a sister company to Ascletis BioScience, sharing the same corporate parent, Ascletis Pharma, all controlled and directed by Jason Wu.

11.     Only six months after its formation, in early 2020, Gannex Pharma secretly began filing several Chinese and United States patent applications that improperly contained certain of Viking VK2809 trade secrets.  Viking discovered this theft and improper disclosure of certain of Viking Trade Secrets after Gannex Pharma's U.S. patent applications published in 2021.  Jason Wu even identified himself as a purported inventor in the Gannex Pharma patent applications.

12.     After successfully stealing and improperly disclosing certain of Viking trade secrets, in mid-2020, two subsidiaries of Ascletis Pharma started clinical trials on Ascletis's drug product, ASC41.  Ascletis Pharmaceuticals ran a trial in China on ASC41 right before Gannex Pharma was formed.  Gannex Pharma then ran four more clinical trials on ASC41 and another drug containing ASC41, namely ASC43F, first in China and then in the United States.  Gannex Pharma has at least two more clinical trials planned.

13.     Gannex Pharma claims that ASC41 is an "in-house" compound, and that its ASC41 formulation was "developed in-house using proprietary technology" that "will accelerate our clinical development to market."  Ex. 1 at 7, Ascletis Pharma Inc., 2019 Annual Report;[1] Ex. 3 at 10, Ascletis Pharma Inc., 2020 Annual Report.[2]  In reality, ASC41 was unlawfully derived from Viking Trade Secrets. Defendants could not have so quickly advanced their development, testing, and commercialization efforts without breaching the CDAs and improperly and intentionally misusing Viking Trade Secrets to Viking's detriment.

---

[1] Exhibit 2 is the Chinese-language version of this report.
[2] Exhibit 4 is the Chinese-language version of this report.

1

**I.      Parties**

2

      **A.      Plaintiff**

3

      14.      Viking is a corporation organized under the laws of Delaware.  It is

4

headquartered at 9220 Pacific Heights Boulevard, Suite 350, San Diego, California

5

92121.  It was founded in 2012.

6

      **B.      Defendants**

7

      15.      The image below illustrates the relationships among Defendants, as

8

explained further below.

9

10

11

12

13

14

15

16

17

18

19

20



21

      **1.      Ascletis Pharma Inc.**

22

      16.      Ascletis Pharma is a corporation organized under the laws of the

23

Cayman Islands that is headquartered in China.  Ex. 5 at cover page, 2, Ascletis

24

Pharma Inc., 2021 Annual Report, https://www1.hkexnews.hk/listedco/listconews/

25

sehk/2022/0420/2022042000544.pdf.[3]  Ascletis Pharma has a registered office in

26

the Cayman Islands (190 Elgin Avenue, George Town, Grand Cayman KY1-9008,

27

28

_____

[3] Exhibit 6 is the Chinese-language version of this report.

Cayman Islands) and places of business in China (12/F, Building D, 198 Qidi Road HIPARK, Xiaoshan District, Hangzhou, Zhejiang Province, China) and Hong Kong (40th Floor Dah Sing Financial Centre, No. 248 Queen's Road East, Wanchai, Hong Kong).  Ex. 5 at 2.

17.     Ascletis Pharma "is an investment holding company.  The Company's subsidiaries are principally engaged in the research and development, production, marketing and sale of pharmaceutical products."  Ex. 5 at 123.

18.     Ascletis Pharma is the parent corporation of Ascletis Bioscience, Ascletis Pharmaceuticals, and Gannex Pharma.  Ex. 5 at 20, 123–24.

19.     Ascletis Pharma was founded by Jason Wu, who is the current Chairman of the Board, CEO, and executive director.  Ex. 5 at 35.

20.     Jason Wu controls the majority of Ascletis Pharma's shares.  Ex. 5 at 45.

21.     Judy Hejingdao Wu, who is Jason Wu's spouse, is another executive director of Ascletis Pharma, and is also a senior vice president of operations.  Ex. 5 at 36.  According to the company's 2021 Annual Report, she "has actively participated in the daily operations of our Group and she is primarily responsible for overseeing operations of our Group, including management of our human resource and general affairs of our Group, among others."  Ex. 5 at 36.

22.     On information and belief, Lindi Tan was CFO of Ascletis Pharma from at least November 2018 to September 2019.  Ex. 7, Ascletis Appoints Dr. Lindi Tan as Chief Financial Officer, PR Newswire (Nov. 11, 2018), https://www.prnewswire.com/news-releases/ascletis-appoints-dr-lindi-tan-as-chief-financial-officer-300747400.html.

23.     From at least March through April 2019, Kristjan Gudmundsson held himself out as Head of Discovery of Ascletis BioScience and Ascletis Pharmaceuticals, including listing "www.ascletis.com" as his company's website in

his corporate email communications.  Ascletis Pharma represents that it owns the website "www.ascletis.com."

### 2.    Ascletis Bioscience

24.    Ascletis Bioscience is a company organized under the laws of the People's Republic of China.  Its address is 12F, Building D, 198 Qidi Road, HIPARK, Xiaoshan District, Hangzhou, Zhejiang Province, PRC, 311200.  It is headquartered in China.  Ex. 8, Contact Us, Ascletis, https://www.ascletis.com/single2/174.html.

25.    Ascletis BioScience's principal activities are the research, development, and commercialization of pharmaceutical products.  Ex. 5 at 123.

26.    Ascletis Bioscience is a wholly owned subsidiary of Ascletis Pharma. Ex. 5 at 20, 123–24.  Specifically, Ascletis BioScience is owned by Ascletis Pharma (China) Co., Limited, an investment holding company.  Ex. 5 at 123. Ascletis Pharma (China) Co., Limited, is owned by PowerTree Investment (BVI) Ltd., an investment holding company.  And PowerTree Investment (BVI) Ltd. is owned by Ascletis Pharma.  Ex. 5 at 123.

27.    Ascletis Bioscience was founded by Jason Wu in 2013.  Ex. 5 at 123.

28.    Jason Wu has been a director and CEO of Ascletis BioScience since 2013.  Ex. 5 at 35.

29.    Judy Hejingdao Wu is "a director and a vice president of Ascletis BioScience, where she is mainly responsible for operations of the company since January 2014."  Ex. 5 at 36.

30.    On information and belief, Heying Yang holds the title of "Supervisor" at Ascletis Bioscience.

31.    An internet search for "Ascletis Bioscience Co., Ltd." leads to Ascletis Pharma's website.

32.    Kristjan Gudmundsson was, and may still be, Head of Discovery at Ascletis BioScience.

33.     On information and belief, Joseph Musto was, and may still be, Senior Director, Clinical Development at Ascletis BioScience.

34.     Upon information and belief, Lindi Tan was the CFO of Ascletis BioScience at all relevant times related to the 2019 CDA, including at least on and around February and March 2019.

### 3.     Gannex Pharma

35.     Gannex Pharma is a company organized under the laws of China.  It is headquartered in China.  Ex. 5.

36.     On information and belief, Gannex Pharma's address is 3F, No. 665 Zhangjiang Road, Pilot Free Trade Zone, Shanghai, China 200000.

37.     Gannex Pharma was founded on September 3, 2019, by Jason Wu, who has been its director and CEO since 2019.  Ex. 5 at 35, 123.  Gannex Pharma is a wholly owned subsidiary of Ascletis Pharma.  Ex. 5 at 20, 123–24; Ex. 9, About GANNEX, Gannex Pharma Co., Ltd., https://www.gannexpharma.com/portal/list/index/id/12.html.

38.     Specifically, Gannex Pharma is owned by SoundRidge Pharmaceuticals (Hong Kong) Co., Limited, an investment holding company.  Ex. 5 at 123.  SoundRidge Pharmaceuticals (Hong Kong) Co., Limited, formerly known as AT Biotherapeutics (Hong Kong) Co., Limited, is owned by AP11 Limited, an investment holding company.  Ex. 5 at 123.  And AP11 Limited is owned by Ascletis Pharma.  Ex. 5 at 123.

39.     On information and belief, Heying Yang holds the title of "Supervisor" at Gannex Pharma.

40.     Gannex Pharma conducts research, development, and commercialization of drugs in the field of NASH.  Ex. 9; *see also* Ex. 5 at 123 ("Manufacture, research, and development of pharmaceutical products.").

41.     Kristjan Gudmundsson is Head of Discovery of Gannex Pharma.

1    42.    Joseph Musto is Senior Director, Clinical Development of Gannex

2    Pharma.

3            **4.    Ascletis Pharmaceuticals**

4    43.    Ascletis Pharmaceuticals is a company organized under the laws of the

5    People's Republic of China.  Its address is No.1 Yunhai Road Binhai New Area,

6    Shaoxing, Zhejiang Province, PRC 312366.  Ex. 8.

7    44.    Ascletis Pharmaceuticals was founded by Jason Wu in 2014, and he

8    has been a director and CEO since 2014.  It is a wholly owned subsidiary of

9    Ascletis Pharma.  Ex. 5 at 35, 123–24.

10    45.    Specifically, Ascletis Pharmaceuticals is owned by Ascletis

11    BioScience.  Ascletis BioScience is ultimately owned by Ascletis Pharma, as

12    explained above.

13    46.    Judy Hejingdao Wu is "a vice president of Ascletis Pharmaceuticals

14    where she is mainly responsible for operations of the company from September

15    2014 to December 2021."  Ex. 5 at 36.

16    47.    On information and belief, Heying Yang holds the title of "Supervisor"

17    at Ascletis Pharmaceuticals.

18    48.    Ascletis Pharmaceuticals is involved in the manufacture,

19    commercialization, and research and development of pharmaceutical products.  Ex.

20    5 at 124.

21    49.    From at least March through April 2019, Kristjan Gudmundsson held

22    himself out as Head of Discovery at Ascletis Pharmaceuticals.

23            **5.    Jason Wu**

24    50.    Jason Wu is the founder, director, and CEO of Ascletis BioScience.

25    Ex. 5 at 35.

26    51.    Jason Wu is the founder, Chairman, executive director, and CEO of

27    Ascletis Pharma.  Ex. 5 at 35.

28

52.    According to Ascletis Pharma's 2021 Annual Report, he "is primarily responsible for overall management of the business strategy and corporate development of our Group." Ex. 5 at 35.

53.    Jason Wu is the founder, director, and CEO of Gannex Pharma.  Ex. 5 at 35.

54.    Jason Wu is a director and CEO of Ascletis Pharmaceuticals.  Ex. 5 at 35.

55.    Jason Wu is listed as a purported inventor on all of Gannex Pharma's published U.S. patent applications and issued patents.  *See, e.g.*, Exs. 10–13.

56.    On information and belief, Jason Wu is an American citizen who is domiciled in Washington.  *See* Ex. 5 at 154.

**II.    Jurisdiction and Venue**

**A.    Subject Matter Jurisdiction**

57.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises, in part, under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.  This Court also has jurisdiction over this matter pursuant to 18 U.S.C. § 1836(c).

58.    This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.

59.    Viking is a citizen of California and Delaware.  Ascletis Pharma is a citizen of the Cayman Islands and China and/or Hong Kong.  Ascletis BioScience, Gannex Pharma, and Ascletis Pharmaceuticals are citizens of China.  Jason Wu is a citizen of Washington.

60.    The matter in controversy in this action exceeds $75,000.

61.    This Court possesses supplemental jurisdiction over Viking's state-law claims pursuant to 28 U.S.C. § 1367(a) because Viking's federal and state law claims derive from a common nucleus of operative facts.

**B.      Personal and Extraterritorial Jurisdiction**

      **1.      Ascletis BioScience**

62.      This Court has personal jurisdiction over Ascletis BioScience.

63.      Ascletis BioScience purposefully directed its activities toward California; consummated at least two transactions with a resident of California; and performed acts by which it purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws. Specifically, as explained in more detail below, Ascletis BioScience, via email communications with Viking employees located in California, entered into two contracts with Viking, a company headquartered in California, to facilitate the sharing and soliciting of Viking's confidential information and trade secrets with Ascletis BioScience.  Pursuant to those contracts, Viking took actions in California to allow Ascletis BioScience to view its trade secrets.  Ascletis BioScience then intentionally misappropriated Viking's trade secrets that were among the shared confidential information, and in the process breached the contracts between Viking and Ascletis BioScience.  Therefore, Ascletis BioScience purposefully contracted with a California company, obtained trade secrets from that California company, and then misappropriated those secrets and breached those contracts, knowing that its actions would cause harm to that company in California.  Other specific wrongful acts leading to harm in California are described below.

64.      Viking's claims against Ascletis BioScience arise out of and relate to Ascletis BioScience's activities related to California described above.  Specifically, Viking's claims against Ascletis BioScience arise out of intentional contracting with a company known to be headquartered in California and intentional acts of misappropriation and breach of contract stemming from that contracting.

65.      The exercise of personal jurisdiction by this Court over Ascletis BioScience would comport with notions of fair play and substantial justice, *i.e.*, it would be reasonable.

- 10 -

66.     This Court has extraterritorial jurisdiction over the acts of Ascletis BioScience.  Ascletis BioScience conducted acts in furtherance of the misappropriation of Viking's trade secrets in the United States, specifically in California.  These acts in furtherance include email communications with Viking employees located in California, entering into two contracts with Viking, a company headquartered in California, to facilitate the sharing of Viking's confidential information and trade secrets with Ascletis BioScience, intentionally misappropriating Viking's trade secrets that were among the shared confidential information, and in the process breaching the contracts between Viking and Ascletis BioScience, including as described above and below.

### 2.     Gannex Pharma

67.     This Court has personal jurisdiction over Gannex Pharma.

68.     Gannex Pharma purposefully directed its activities toward California and performed acts by which it purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws.  Specifically, as explained in more detail below, Gannex Pharma intentionally misappropriated Viking's trade secrets while knowing or having reason to know that the trade secrets belonged to Viking, a California company.  Although Gannex Pharma did not purport to sign the contracts with Viking, Gannex Pharma and Ascletis BioScience are owned by the same parent company, were founded by and are led by the same individual, are in the same line of business, and have had several of the same senior employees.  Therefore, Gannex Pharma's actions in concert with Ascletis BioScience show that Gannex Pharma purposefully directed its activities toward California and performed acts by which it purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws.  Gannex Pharma also, on information and belief, induced Ascletis BioScience to breach its contracts with Viking.  Therefore, Gannex Pharma purposefully harmed a California company

1    while knowing that the harm would be felt by that company in California.  Other

2    specific wrongful acts leading to harm in California are described below.

3         69.    Viking's claims against Gannex Pharma arise out of and relate to

4    Gannex Pharma's activities related to California described above.  Specifically,

5    Viking's claims against Gannex Pharma arise out of intentional acts of

6    misappropriation and other unlawful acts stemming from Gannex Pharma's sister

7    company contracting with a California resident while Gannex Pharma knew or

8    should have known that those actions would cause harm felt in California by a

9    California resident.

10        70.    The exercise of personal jurisdiction by this Court over Gannex

11   Pharma would comport with notions of fair play and substantial justice, *i.e.*, it

12   would be reasonable.

13        71.    This Court also has personal jurisdiction over Gannex Pharma because

14   this Court has personal jurisdiction over Ascletis BioScience and Gannex Pharma is

15   Ascletis BioScience's alter ego and they are a single enterprise.  Practically,

16   Gannex Pharma and Ascletis BioScience do not have separate minds, wills, or

17   existences, but instead serve as conduits for each other's business.  They have such

18   unity of interests and ownership that the separate personalities of the two entities do

19   not exist, and failure to disregard their separate identities would result in fraud or

20   injustice against Viking.

21        72.    As explained above and below, Gannex Pharma and Ascletis

22   BioScience share a parent company, founder, CEO, line of business, and have had

23   the same high-level employees, including Kristjan Gudmundsson and Joseph

24   Musto.  They also worked together, as described below, to misappropriate Viking's

25   trade secrets, including, on information and belief, using Viking's trade secrets that

26   were obtained through the CDAs entered into by Ascletis BioScience.  For

27   example, as explained below, Gudmundsson and Musto both accessed Viking's

28   secure data room using "@ascletis.com" email addresses pursuant to the 2019 CDA

between Viking and Ascletis BioScience, but Gudmundsson and Musto both are senior employees of Gannex Pharma.

73.     In the alternative, if Gannex Pharma is not otherwise subject to the personal jurisdiction of any state, this Court has personal jurisdiction over Gannex Pharma pursuant to Fed. R. Civ. P. 4(k)(2) because at least one claim against Gannex Pharma arises under federal law and the exercise of jurisdiction would comport with due process due to Gannex Pharma's contacts with the United States as a whole, as described herein.

74.     This Court has extraterritorial jurisdiction over the acts of Gannex Pharma.  Gannex Pharma conducted acts in furtherance of the misappropriation of Viking's trade secrets in the United States, specifically in California.  These acts in furtherance include intentionally misappropriating Viking's trade secrets while knowing or having reason to know that the trade secrets belonged to Viking, a California company and, on information and belief, inducing Ascletis BioScience to breach its contracts with Viking, including as described above and below.  The acts in furtherance also include the acts of Ascletis BioScience as Gannex Pharma's alter ego and importing and manufacturing ASC41 and ASC43F, as discussed below.

### 3.     Ascletis Pharmaceuticals

75.     This Court has personal jurisdiction over Ascletis Pharmaceuticals.

76.     Ascletis Pharmaceuticals purposefully directed its activities toward California and performed acts by which it purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws.  Specifically, as explained in more detail below, Ascletis Pharmaceuticals intentionally misappropriated Viking's trade secrets while knowing or having reason to know that the trade secrets belonged to Viking, a California company.  Although Ascletis Pharmaceuticals did not purport to sign the contracts with Viking, Ascletis Pharmaceuticals and Ascletis BioScience are owned

by the same parent company and are in a direct parent-child relationship with each other, were founded by and are led by the same individual, are in the same line of business, and have had the same senior employees.  Therefore, Ascletis Pharmaceuticals' actions in concert with Ascletis BioScience show that Ascletis Pharmaceuticals purposefully directed its activities toward California and performed acts by which it purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws. Ascletis Pharmaceuticals also, on information and belief, induced Ascletis BioScience to breach its contracts with Viking.  Therefore, Ascletis Pharmaceuticals purposefully harmed a California company while knowing that the harm would be felt by that company in California.  Other specific wrongful acts leading to harm in California are described below.

77.    Viking's claims against Ascletis Pharmaceuticals arise out of and relate to Ascletis Pharmaceuticals activities related to California described above and below.  Specifically, Viking's claims against Ascletis Pharmaceuticals arise out of intentional acts of misappropriation and other unlawful acts stemming from Ascletis Pharmaceuticals' parent company contracting with a California resident while Ascletis Pharmaceuticals knew or should have known that those actions would cause harm felt in California by a California resident.

78.    The exercise of personal jurisdiction by this Court over Ascletis Pharmaceuticals would comport with notions of fair play and substantial justice, *i.e.*, it would be reasonable.

79.    This Court also has personal jurisdiction over Ascletis Pharmaceuticals because this Court has personal jurisdiction over Ascletis BioScience and Ascletis Pharmaceuticals is Ascletis BioScience's alter ego and they are a single enterprise. Practically, Ascletis Pharmaceuticals and Ascletis BioScience do not have separate minds, wills, or existences, but instead serve as conduits for each other's business. They have such unity of interests and ownership that the separate personalities of

the two entities do not exist, and failure to disregard their separate identities would result in fraud or injustice against Viking.

80.     As explained above and below, Ascletis Pharmaceuticals and Ascletis BioScience share a parent company (and are in a direct parent-child relationship), founder, CEO, line of business, and have had at least some of the same high-level employees.  For example, Kristjan Gudmundsson held himself out simultaneously as Head of Discovery of Ascletis BioScience and Ascletis Pharmaceuticals.  The two companies also worked together, as described below, to misappropriate Viking's trade secrets, including, on information and belief, using Viking's trade secrets that were obtained using access provided pursuant to the CDAs entered into by Ascletis BioScience.

81.     In the alternative, if Ascletis Pharmaceuticals is not otherwise subject to the personal jurisdiction of any state, this Court has personal jurisdiction over Ascletis Pharmaceuticals pursuant to Fed. R. Civ. P. 4(k)(2) because at least one claim against Ascletis Pharmaceuticals arises under federal law and the exercise of jurisdiction would comport with due process due to Ascletis Pharmaceuticals' contacts with the United States as a whole, as described herein.

82.     This Court has extraterritorial jurisdiction over the acts of Ascletis Pharmaceuticals.  Ascletis Pharmaceuticals conducted acts in furtherance of the misappropriation of Viking's trade secrets in the United States, specifically in California.  These acts in furtherance include intentionally misappropriating Viking's trade secrets while knowing or having reason to know that the trade secrets belonged to Viking, a California company and, on information and belief, inducing Ascletis BioScience to breach its contracts with Viking, including as described above and below.  The acts in furtherance also include the acts of Ascletis BioScience as Ascletis Pharmaceuticals' alter ego and importing and manufacturing ASC41, as discussed below.

1          **4.      Ascletis Pharma**

2          83.     This Court has personal jurisdiction over Ascletis Pharma because this

3  Court has personal jurisdiction over Ascletis BioScience and Ascletis Pharma is

4  Ascletis BioScience's alter ego.  Ascletis Pharma and Ascletis BioScience have

5  such unity of interests and ownership that the separate personalities of the two

6  entities do not exist, and failure to disregard their separate identities would result in

7  fraud or injustice against Viking.

8          84.     As explained above and below, Ascletis Pharma is Ascletis

9  BioScience's parent company and they share a founder, CEO, line of business, and

10  have had at least some of the same high-level employees.  For example, Kristjan

11  Gudmundsson held himself out as Head of Discovery of both Ascletis BioScience

12  and Ascletis Pharmaceuticals, which are both wholly owned subsidiaries of Ascletis

13  Pharma.  They also worked together, as described below, to misappropriate

14  Viking's trade secrets, including using Ascletis Pharma's other subsidiaries,

15  Gannex Pharma and Ascletis Pharmaceuticals.

16          85.     Additionally, the companies acted as if they were one and the same.

17  For example, Lindi Tan and Jason Wu viewed Viking's confidential information,

18  including trade secrets, pursuant to the 2019 CDA between Viking and Ascletis

19  BioScience while she was CFO of Ascletis Pharma and he was CEO of Ascletis

20  Pharma, among other roles.  The companies also use a common address: 12F,

21  Building D, 198 Qidi Road, HIPARK, Xiaoshan District, Hangzhou, Zhejiang

22  Province, PRC, 311200.

23          86.     This Court alternatively has personal jurisdiction over Ascletis Pharma

24  because many of the actions purportedly taken in the name of Ascletis BioScience,

25  described herein, were taken by individuals that also worked for Ascletis Pharma.

26  On information and belief, those individuals were acting on behalf of Ascletis

27  Pharma when they took those actions.  For example, Lindi Tan accessed Viking's

28  confidential information, including trade secrets, via Viking's secure data room

pursuant to the 2019 CDA entered into by Ascletis BioScience while she was CFO of Ascletis Pharma; Kristjan Gudmundsson accessed Viking's confidential information via Viking's secure data room pursuant to the 2019 CDA entered into by Ascletis BioScience while his email signature included a link to Ascletis Pharma's website, he simultaneously held a position at another wholly owned subsidiary of Ascletis Pharma (Ascletis Pharmaceuticals), and he later held a position at another wholly owned subsidiary of Ascletis Pharma (Gannex Pharma); Joseph Musto accessed Viking's confidential information via Viking's secure data room pursuant to the 2019 CDA entered into by Ascletis BioScience and he later held a position at another wholly owned subsidiary of Ascletis Pharma (Gannex Pharma); Jason Wu accessed Viking's confidential information via Viking's secure data room pursuant to the 2019 CDA entered into by Ascletis BioScience while he simultaneously was Chairman of the Board, an executive director, and CEO of Ascletis Pharma; and Judy Wu signed the 2019 CDA on behalf of Ascletis BioScience while she was an executive director and vice president of Ascletis Pharma.

87.    In the alternative, if Ascletis Pharma is not otherwise subject to the personal jurisdiction of any state, this Court has personal jurisdiction over Ascletis Pharma pursuant to Fed. R. Civ. P. 4(k)(2) because at least one claim against Ascletis Pharma arises under federal law and the exercise of jurisdiction would comport with due process due to Ascletis Pharma's contacts with the United States as a whole, as described herein.

88.    This Court has extraterritorial jurisdiction over the acts of Ascletis Pharma.  Ascletis Pharma conducted acts in furtherance of the misappropriation of Viking's trade secrets in the United States, specifically in California.  These acts in furtherance include those described above and below, including those purportedly taken in the name of Ascletis BioScience.  The acts in furtherance also include the acts of Ascletis BioScience as Ascletis Pharma's alter ego.

1

          **5.    Jason Wu**

2

    89.    This Court has personal jurisdiction over Jason Wu.

3

    90.    Jason Wu purposefully directed his activities toward California; consummated at least one transaction with a resident of California; and performed acts by which he purposefully availed himself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws. Specifically, Jason Wu individually and on behalf of Defendants led the Defendant organizations in their coordinated efforts to misappropriate Viking's trade secrets and was, on information and belief, a direct participant in, and controlled, those efforts. Namely, he was at a minimum the CEO of Ascletis BioScience, Gannex Pharma, Ascletis Pharmaceuticals, and Ascletis Pharma when the actions described in this complaint were taken. He was also majority shareholder of Ascletis Pharma, which itself owns the other companies. Given his role as head of, and majority shareholder of, the several companies that coordinated to misappropriate Viking's trade secrets and breach the contracts with Viking, he, on information and belief, exercised significant control and provided significant direction and authorization related to the actions described herein. He also named himself as a purported inventor of the patents and patent applications that disclose Viking's trade secrets. Wu's activities are consistent with Ascletis Pharma's 2021 Annual Report, which states that he is "involved in research and development of all of the candidates in the Group's pipeline, including but not limited to . . . ASC41." Ex. 5 at 35.

    91.    The actions resulting in personal jurisdiction over Jason Wu also include overseeing Ascletis BioScience entering into contracts with Viking, a company headquartered in California, to facilitate the sharing and soliciting of Viking's confidential information with his company. In line with that contract, Viking took actions in California to allow Jason Wu and his company to view Viking's trade secrets, and he himself viewed Viking's confidential material in the secure data room. Jason Wu then intentionally misappropriated Viking's trade

secrets that were among the shared confidential information, and in the process breached the contracts between Viking and Ascletis BioScience.  Therefore, Jason Wu purposefully directed contracting with a California company, obtaining trade secrets from that California company, and then misappropriating those secrets and breaching those contracts, knowing that his actions would cause harm to that company in California.  Other specific wrongful acts leading to harm in California are described below.

92.     Viking's claims against Jason Wu arise out of and relate to his activities related to California described above.  Specifically, Viking's claims against Jason Wu arise out of intentional contracting with a company known to be headquartered in California and intentional acts of misappropriation and breach of contract stemming from that contracting.

93.     The exercise of personal jurisdiction by this Court over Jason Wu would comport with notions of fair play and substantial justice, *i.e.*, it would be reasonable.

94.     This Court also has personal jurisdiction over Jason Wu because the above Defendant companies are his alter egos and this Court has personal jurisdiction over those companies.  They have such unity of interests and ownership that the separate personalities of the two entities do not exist, and failure to disregard their separate identities would result in fraud or injustice against Viking.

95.     As explained above, Ascletis Pharma is the parent company of all other Defendant companies, and Jason Wu controls a majority of Ascletis Pharma's shares.  He is also the founder and CEO of all of the Defendant companies and has enlisted common high-level employees across the companies.  The Defendant companies also worked together, as described below, to misappropriate Viking's trade secrets, including by applying for patents that list Jason Wu as a purported inventor and disclose Viking's trade secrets.

96.     In the alternative, if Jason Wu is not otherwise subject to the personal jurisdiction of any state, this Court has personal jurisdiction over him pursuant to Fed. R. Civ. P. 4(k)(2) because at least one claim against him arises under federal law and the exercise of jurisdiction would comport with due process due to his contacts with the United States as a whole, as described herein.

97.     This Court has extraterritorial jurisdiction over the acts of Jason Wu. Jason Wu conducted acts in furtherance of the allegations herein, including the misappropriation of Viking's trade secrets in the United States, specifically in California.  These acts in furtherance include leading the Defendant organizations in their coordinated efforts to commit the activities described herein and misappropriate Viking's trade secrets, on information and belief directly participating in and controlling those efforts, on information and belief exercising significant control and providing significant direction and authorization related to the actions described herein, and overseeing Ascletis BioScience entering into contracts with Viking, a company headquartered in California, to facilitate the sharing of Viking's confidential information with his company, including as described above and below.  The acts in furtherance also include the acts of Ascletis BioScience as Ascletis Pharma's alter ego.

**C.     Venue**

98.     Venue is proper within this district.

99.     None of the Defendant entities are resident in the United States, and "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants."  28 U.S.C. § 1391(c)(3).

100.     Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this district.  28 U.S.C. § 1391(b)(2). Namely, as explained in this complaint, Ascletis BioScience communicated with

Viking, which is located in this district, to facilitate signing the CDAs, and Viking then provided access to its confidential information, including trade secrets, from this district.  The harm from Defendants' actions was also felt, and continues to be felt, by Viking in this district.  The property that is the subject of this action—Viking's trade secrets—is also located in this district.

101.   To the extent there is no district in which an action may otherwise be brought as provided in 28 U.S.C. § 1391(b)(1)–(2), venue is proper in this district because a Defendant is subject to this Court's personal jurisdiction with respect to this action.

## III.   Factual Allegations

### A.   Development of VK2809

#### 1.   Non-Alcoholic Steatohepatitis (NASH)

102.   "Non-alcoholic steatohepatitis (NASH) is an advanced form of non-alcoholic fatty liver disease (NAFLD).  NAFLD is caused by buildup of fat in the liver. When this buildup causes inflammation and damage, it is known as NASH, which can lead to scarring of the liver."[4]  Further progression of NASH can result in liver fibrosis, which results in the formation of an abnormally large amount of scar tissue in the liver.

103.   In the United States, the number of patients with hypercholesterolemia is estimated to be greater than 100 million and approximately 31.7% of American adults, or 73.5 million people, have high LDL cholesterol (colloquially, "bad cholesterol").

104.   In the United States, NAFLD affects up to 25% of the population.  As mentioned, NAFLD can lead to NASH, a severe form which involves inflammation and cell damage.  "NASH is a growing epidemic in the U.S. and is quickly

---

[4] https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/non-alcoholic-steatohepatitis-nash.html

becoming a leading cause of cirrhosis and liver failure.  It is estimated that NASH affects 2% to 5% of Americans."[5]

105.   NAFLD is the most common chronic liver condition in Western populations and is fueled by the obesity and type 2 diabetes epidemics.[6]  NASH prevalence is expected to increase by 63% between 2015 and 2030.[7]  NASH is expected to become the leading cause of liver transplantation in the United States between 2020 and 2025.[8]  Total annual costs for inpatient, outpatient, physician, and pharmacy services rose from $19,908 in NAFLD/NASH with no progression to $129,276 for those patients in need of liver transplants.[9]

106.   Currently, there are no therapies approved by the FDA for the treatment of NASH.

107.   Several companies have development-stage programs targeting NASH, and many more companies have active programs for treatments targeting NASH, including Defendants.

## 2.   Metabasis and Ligand

108.   Metabasis Therapeutics is a Delaware biopharmaceutical company "focused on discovery, development and commercialization of novel small molecule drugs," primarily addressing liver diseases, that was founded in 1997.  Ex. 14.  Metabasis developed a drug known as MB07811 in or around 2005 to 2006,

[5] https://www.vikingtherapeutics.com/pipeline/metabolic-disease-program/.

[6] https://www.the-nash-education-program.com/what-is-nash/how-prevalent-is-nash/

[7] Estes C, Razavi H, Loomba R, *et al*. Modeling the epidemic of nonalcoholic fatty liver disease demonstrates an exponential increase in burden of disease. *Hepatology*. 2018; 67(1):123–33.

[8] Wong RJ, Aguilar M, Cheung R, *et al*. Nonalcoholic steatohepatitis is the second leading etiology of liver disease among adults awaiting liver transplantation in the United States. *Gastroenterology*. 2015;148:547–55.

[9] C. Gordon, *et al*. Disease Severity Is Associated With Higher Healthcare Utilization in Nonalcoholic Steatohepatitis Medicare Patients. *The American Journal of Gastroenterology*: Apr. 2020:115(4):562–74.

1  and this drug later became known as VK2809.[10]  VK2809 is a novel, orally

2  available, small molecule selective thyroid hormone receptor beta ("TR-β") agonist

3  for the treatment of lipid and metabolic disorders.  VK2809 showed potential to

4  become an effective treatment of NASH.

5         109.   Active pharmaceutical ingredients ("API") such as VK2809 are

6  combined with other compounds, known as excipients, to create a formulation that

7  is readily available to patients, offers suitable bioavailability of the API, and

8  provides a convenient route of administration for optimal patient compliance.

9  Different formulations may have different storage requirements based on the drug's

10 stability within the particular formulation.

11        110.   Formulating VK2809 proved to be a difficult task in attempting to

12 create a stable solid state form.  Formulating VK2809 took significant effort that

13 required research and development of various forms.

14        111.   After extensive research and development, Metabasis eventually

15 developed a specific formulation for VK2809.  The development of VK2809 was

16 one of Metabasis's assets that received the greatest amount of focus and effort.

17        112.   This VK2809 formulation had a trade secret formulation that included

18 several ingredients—VK2809 API and certain secret excipients.

19        113.   In formulating VK2809, Metabasis first evaluated the solubility of the

20 VK2809 API with different excipients, and different combinations of excipients.

21 This was followed by stability assessments.

22        114.   The process of selecting and testing different excipients drew on

23 Metabasis's significant prior experience in clinical testing and formulating clinical

24 therapies.

25

26

_____

27 [10] The first two letters represent the company using the name (MB for Metabasis,
   VK for Viking), but the drug substance identified by each is the same.  For
28 simplicity, this complaint refers to the drug itself as VK2809 throughout.

115.   As a result of Metabasis's prior experience and expertise, Metabasis was able to select certain excipients that were well-suited to VK2809 based on VK2809's physicochemical properties.  Metabasis's experience and expertise allowed it to target certain dose ranges, which required a certain level of solubility. The development of the VK2809 specific formulation was the product of expansive expertise and history in formulating clinical therapies.

116.   The specific formulation and information about the formulation, including, among other things, the certain steps used for preparation, are not public, not readily ascertainable, have significant value, and are Viking Trade Secrets.

117.   The specific formulation has certain properties, which are not public, not readily ascertainable, valuable, and Viking Trade Secrets.

118.   Metabasis's research resulted in valuable information about VK2809 as a standalone API and when it is in the specific formulation, which is not public, not readily ascertainable, valuable, and Viking Trade Secrets.

119.   Metabasis kept the above research and development and formulation results as trade secrets.

120.   Metabasis created its first lot of its specific VK2809 formulation in March 2006 for use in Phase 1 trials.  These Phase 1 trials met the primary endpoint criteria for pharmacokinetics and safety.

121.   Metabasis also conducted animal toxicity studies and pharmacology studies regarding the effects of VK2809, including microscopic evaluation.

122.   As described below, Viking later licensed VK2809, and thereafter also conducted multiple studies as part of its own research and development.  Much of Viking's pre-clinical and clinical trial information and data necessary for commercialization are not public, not readily ascertainable, valuable, and Viking Trade Secrets.

123.   Metabasis was issued U.S Patent No. 7,829,552 for the VK2809 composition of matter.

124.   Metabasis filed numerous other patent applications related to VK2809. For example, Metabasis is the assignee of U.S. Patent No. 10,925,885, entitled "Thyromimetics for the Treatment of Fatty Liver Diseases" and U.S. Patent No. 7,514,419, entitled "Phosphorus-Containing Thyromimetics."  Both of these patents relate to VK2809.

125.   In 2010, Metabasis was acquired by Ligand Pharmaceuticals Inc. ("Ligand").  Ligand is a corporation that "discovers and develops new drugs that address critical unmet medical needs of patients with hepatitis, muscle wasting, frailty, hormone-related diseases, osteoporosis, inflammatory diseases, anemia, asthma, rheumatoid arthritis and psoriasis."[11]  Ligand is a corporation organized under the laws of Delaware and has its principal executive offices in California.

### 3.   Viking

126.   Viking is a clinical-stage biopharmaceutical company focused on the development of novel therapies for the treatment of metabolic and endocrine disorders.  It was founded in 2012 by its current CEO, Brian Lian.

127.    "Since [its] incorporation, [Viking has] devoted substantially all of [its] efforts to raising capital, building infrastructure and obtaining the worldwide rights to certain technology, including VK2809, VK0214 and VK5211, and conducting certain clinical trials and preclinical studies related to these programs."[12]

128.   VK2809 is Viking's leading drug product candidate, resulting from investments of substantial time and money.

---

[11] https://investor.ligand.com/press-releases/detail/169/ligand-completes-acquisition-of-metabasis.
[12] Viking Therapeutics, Inc., Annual Report for the Fiscal Year Ended Dec. 31, 2021, at 11, https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=116438097&type=PDF&symbol=VKTX&companyName=Viking+Therapeutics+Inc.&formType=10-K&dateFiled=2022-02-09&CK=1607678

129.   In 2014, Viking acquired from Ligand and Metabasis an exclusive license to commercialize and develop licensed products, including VK2809.

130.   The license to Viking includes, among other things, an exclusive license to commercialize TR-β compounds (including MB07811, later known as VK2809) and an exclusive license to Metabasis and Ligand's related trade secrets (now Viking Trade Secrets).  This license is exclusive even as to Metabasis and Ligand.  Under the license, Metabasis and Ligand transferred all related trade secrets to Viking.  The license is exclusive, perpetual, irrevocable, and worldwide.

131.   The license gives Viking the exclusive right to bring suit for misappropriation of the licensed and transferred trade secret materials.

132.   Ligand and Metabasis retain ownership rights in all licensor technology and intellectual property prior to the effective date, but thereafter, any invented technology or know-how developed by or for Viking shall be owned by Viking.

133.   After acquiring the rights to VK2809, and over several years, Viking conducted multiple trials and extensive research and development into VK2809 with the ultimate goal of bringing it to market.

134.   In 2015, Viking designed a phase 2A clinical study protocol for VK2809.

135.   In November 2019, Viking initiated a phase 2B clinical trial of VK2809 in patients with biopsy-confirmed NASH.  The phase 2B clinical trial is designed to study efficacy, safety, and tolerability of VK2809.

136.   Overall, VK2809 has been evaluated in eight completed clinical trials with positive results.

137.   Viking documented a significant amount of confidential information and trade secrets concerning VK2809 in an Investigator's Brochure.  This Investigator's Brochure includes information such as physical, chemical, and pharmaceutical properties and formulation of VK2809; descriptions of non-clinical

(*e.g.*, pre-clinical) pharmacology and toxicology studies; descriptions of clinical studies; and data and guidance for investigators. The Investigator's Brochure is marked Confidential and Viking maintains this document and its contents as a Viking Trade Secret.

### B. Viking's Trade Secrets

138.   For purposes of this complaint, "Viking Trade Secrets" refers to trade secrets owned or exclusively licensed by Viking that were shared with Defendants' employees, agents, or personnel under one or both of the 2016 CDA and 2019 CDA described below (collectively  "the CDAs") [13] under restrictions of use and obligations of confidentiality. The Viking Trade Secrets include those viewed by individuals using @ascletis.com email addresses in Viking's secure data room on or around 2019.

139.   Defendants improperly used and continue to use and disclosed certain Viking Trade Secrets that were accessed in Viking's secure data room. The Viking secure data room contained hundreds of highly-valuable and non-public confidential information and trade secrets, including secret technical information, clinical information, non-clinical information, general pharmacology information, safety pharmacology information, general toxicology information, absorption distribution, metabolism excretion ("ADME") studies, animal studies, *in vitro* testing, *in vivo* testing, safety pharmacology information, test results, and other information relating to Viking's VK2809 product. The Viking Trade Secrets

---

[13] References to breach of the CDAs are intended to refer to breaches related to the exchanges of information surrounding both the 2016 CDA and 2019 CDA. Because the 2019 CDA supersedes the 2016 CDA by its terms, breaches related to the exchanges of information surrounding either CDA are alleged as breaches of the 2019 CDA. However, to the extent it is necessary to allege violations of the 2016 CDA specifically, and for the avoidance of doubt, Viking also alleges breach of the 2016 CDA by any reference to breach of the CDAs regarding exchanges of information surrounding the 2016 CDA.

include, but are not limited to, the following trade secret documents and information therein concerning VK2809:

- A specific formulation of VK2809 with certain excipients.
- Manufacturing and preparation of the specific formulation
- Techniques for storing the specific formulation
- Certain attributes of the specific formulation, including its stability and solubility
- Pre-clinical and clinical trial information and data necessary for commercialization.
- The combination of the above Viking Trade Secrets.
- Clinical studies of VK2809 and resulting data:
  - Safety, tolerability, pharmacokinetic, and efficacy studies.
  - Viking's Investigator's Brochure, containing detailed information on:
    - Indications, including strategy and approach for evaluating such indications of VK2809
    - Physical, chemical, and pharmaceutical properties including:
      - Formulation
      - Storage and Handling
    - Summaries of non-clinical pharmacology, pharmacokinetic, and toxicology studies
    - Summaries of clinical pharmacokinetic, pharmacodynamic and safety studies
    - Marketing experience
    - Summaries of data and guidance for investigators, including:
      - Indications and usage
      - Rationale for dosage and administration
      - Dosage forms and strengths
      - Storage conditions

- Contraindications
- Warnings and precautions
- Clinical adverse reactions
- Drug indications
- Use in specific populations
- Overdose
  - Summaries of test data, including demographics, baselines, subject conditions, adverse events, and lab parameters.
- Non-clinical studies of VK2809 and resulting data:
  - General toxicology studies.
  - Safety Pharmacology Studies, including *in vitro* and *in vivo*.
  - Non-Clinical Safety Study Reports, including:
    - Safety Pharmacology Studies, both *in vitro* and *in vivo*
    - General Toxicology Studies in rats and monkeys
    - Genetic Toxicology Studies
- Pharmacology studies of VK2809 :
  - Primary pharmacology studies.
  - Safety pharmacology studies.
- Pharmacokinetic, ADME, Drug-Drug Interaction ("DDI") studies of VK2809.
- Other confidential information shared with Defendants' employees, agents, or personnel under the CDAs under restrictions of use and obligations of confidentiality.

140.   Defendants improperly used and disclosed and continue to use and disclose certain of Viking Trade Secrets, including as described below.

141.   Viking has the right to assert in this action the Viking Trade Secrets, including those listed above, as either the owner or exclusive licensee.

142.   Viking is the exclusive licensee and has the right to assert Viking's Trade Secrets developed before May 21, 2014, under its license with Ligand.

### C.   Viking's History with Defendants

#### 1.   Confidential Disclosure Agreements ("the CDAs")

143.   In May 2016, an entity identifying itself as Ascletis, Inc., requested to meet with Viking at the 2016 BIO International Convention in San Francisco.  The BIO International Convention 2016 concluded on June 9, 2016.

144.   On July 8, 2016, Viking entered into a CDA with Ascletis BioScience ("2016 CDA") to facilitate a potential business opportunity or transaction of mutual interest regarding VK2809.  The 2016 CDA required Ascletis BioScience to keep confidential any confidential information, including trade secrets, disclosed to it by Viking and only use the confidential information and trade secrets to explore the business opportunity with Viking related to VK2809.

145.   Around August 2016, Viking shared with Ascletis Viking Trade Secrets relating to VK2809 under the 2016 CDA.  Those Viking Trade Secrets provided enough information to prompt Ascletis to seek out additional information from Viking regarding VK2809 such as:  (1) the targeting of TR alpha vs. beta, patent protection information and synthesis of the VK2809 API and its metabolized form, VK2809A; (2) the rationale and stability of the specific formulation, as well as Viking's next steps for the evolution of the formulation; (3) toxicology information as well as Viking's next steps for future studies; and (4) details of the clinical plans.  Specifically, on August 9, 2016, Spike Lo, who held himself out as Ascletis BioScience's then-Associate Director of Business Development, emailed Viking requesting to "set up the very first call for both sides on next week."  Jason Wu and Kristjan Gudmundsson were copied on Lo's email.

146.   Viking and Ascletis BioScience ultimately did not move forward with a VK2809 transaction in 2016, but Ascletis BioScience reached out to Viking again in 2019.

147. In February 2019, at Ascletis BioScience's request, Brian Lian, CEO of Viking, again spoke with Ascletis BioScience about its interest in NASH diseases and Ascletis BioScience stated that they were looking for "a partnership for China license of NASH drug candidates."

148. On March 6, 2019, Kristjan Gudmundsson emailed Brian Lian and asked, "Find attached the CDA we signed in 2016, we could update?"  Jason Wu and Lindi Tan were copied on Gudmundsson's email.

149. Shortly after these communications, Viking entered into a CDA with Ascletis BioScience in March 2019 to explore a business opportunity regarding VK2809 ("2019 CDA").  Judy Wu signed for Ascletis BioScience.

150. Like the 2016 CDA, the 2019 CDA required Ascletis BioScience to keep confidential any confidential information, including trade secrets, disclosed to it by Viking and only use the confidential information and trade secrets to explore the business opportunity with Viking related to VK2809.

151. The 2019 CDA states that "This Agreement supersedes all prior discussions and writings with respect to the subject matter hereof, and constitutes the entire agreement of the Parties with respect to the subject matter hereof."

152. The 2019 CDA defines "Confidential Information" as "all information, whether disclosed before or after the Effective Date, that is disclosed in written, oral, electronic, visual or other form by the Disclosing Party to the Receiving Party and (i) is marked or identified as 'confidential' or 'proprietary,' or (ii) would reasonably be expected to be confidential in nature at the time of disclosure because it gives an actual or potential competitive advantage to the Disclosing Party as a result of not being widely known, or (iii) is disclosed under circumstances under which it reasonably appears that it would not be disclosed to the Receiving Party without the Receiving Party's commitment to treat the information as confidential. Confidential Information shall include, without limitation, trade secrets, know-how, inventions, technical data or specifications, testing methods, prototypes, products,

formulas, business or financial information, contracts with third parties, research and development information, product and marketing plans, customer, licensor, and supplier information and all information generated therefrom including analyses, summaries, extracts and evaluations thereof."

153.   The 2019 CDA provides that "This Agreement will pertain to any and all Confidential Information disclosed by Recipient by or on behalf of Company during or prior to the Term."

154.   The 2019 CDA obligates the party that receives confidential information from the other party to:

"(i) maintain such Confidential Information in strict confidence, using efforts at least as protective as those employed by the Receiving Party for the protection of its own proprietary information of like nature;

(ii) use such Confidential Information only as required for the Purpose;

(iii) not disclose or permit the disclosure of such Confidential Information to any persons other than to its directors, officers, or employees (collectively 'Personnel') who need to know such Confidential Information for the Purpose and who are bound by written obligations of non-disclosure and non-use of such Confidential Information which are at least as stringent as those set forth herein; and

(iv) reproduce Confidential Information only to the extent necessary for the Purpose, with all such reproductions being marked and treated as Confidential Information."

155.   According to the 2019 CDA, each "Party agrees that the Disclosing Party is and shall remain the exclusive owner of the Confidential Information disclosed by the Disclosing Party and of all patent, copyright, trademark, trade secret and other intellectual property rights in, or arising from, such Confidential Information."  Furthermore, "[n]o option, license or conveyance of such rights to the Receiving Party is granted or implied under this Agreement, and the Receiving

Party acknowledges that it may not use Confidential Information of the Disclosing Party other than for the Purpose."

156.   Purpose is defined in the 2019 CDA as "to engage in discussions regarding exploration of a business opportunity and/or transaction of mutual interest regarding Viking's Thyroid Receptor Beta Agonist Program, VK2809."

157.   The 2019 CDA also requires that the party receiving confidential information from the other party "not (i) create or develop any derivative works, discoveries, or improvements, or (ii) make, have made, use or sell any product or provide any service, using, incorporating, or derived from any Confidential Information of the Disclosing Party ('New Disclosing Party IP')."  In the event that a receiving party does create or develop any New Disclosing Party IP, that party must promptly disclose such New Disclosing Party IP to the disclosing party and ownership therein shall vest in the disclosing party.  The receiving party "assigns all right, title and interest in and to any and all New Disclosing Party IP to the Disclosing Party."

158.   Regarding patents specifically, "[t]he Receiving Party agrees not to file any patent application(s) disclosing or claiming Confidential Information of the Disclosing Party.  In the event of any violation of this Section 4, the Receiving Party agrees that it will assign and hereby does assign all right, title and interest in and to each such patent application to the Disclosing Party."

159.   The term of the 2019 CDA was two years, which would have concluded on March 7, 2021.  However, either party was permitted to terminate the 2019 CDA at any time prior to the expiration date, for any reason, by sending written notice of its intent to do so to the other Party.  Notwithstanding any such termination, all rights and obligations in the 2019 CDA survive with respect to all confidential information disclosed prior to the termination, subject only to specific exceptions in Section 2.C of the 2019 CDA.

160.   The terms of the 2016 CDA are identical in all relevant parts to the terms of the 2019 CDA.

161.   The CDAs are the only agreements, written or otherwise, between Viking and any Defendant regarding consent to use or disclose information provided by Viking to any Defendant.

### 2.   Secure Data Room

162.   On March 13, 2019, after Viking and Ascletis BioScience entered into the 2019 CDA, Kristjan Gudmundsson, who Viking understood to be head of Discovery for Ascletis BioScience, requested access for several individuals to Viking's secure data room pursuant to the 2019 CDA.  The secure data room is an electronic repository on a computer server that contained Viking's confidential information and Viking Trade Secrets.

163.   Viking's secure data room was hosted on U.S. servers.

164.   Viking granted the requests for secure data room access and data was first accessed by these individuals around March 2019.

165.   The following individuals, which were the individuals requested by Gudmundsson, were granted access to the secure data room from an "@ascletis.com" email address:

- Jason Wu
- Kristjan Gudmundsson
- Lindi Tan
- Joseph Musto

166.   Using the "@ascletis.com" email addresses, the above individuals accessed Viking Trade Secrets in the secure data room, including Viking's Investigator's Brochure described above.

167.   In the secure data room, Defendants accessed multiple dozens of documents containing hundreds of Viking Trade Secrets, including, specifically, the documents described above.

168.   On the same day that Viking first granted secure data room access to Ascletis BioScience under the 2019 CDA, and after spending less than five minutes in the secure data room and viewing only a single document, Gudmundsson emailed Medardo Chavez, then-Director of Business Development of Viking, to request even more Viking Trade Secret information beyond what Viking had shared in the secure data room.  Gudmundsson asked for certain information regarding Viking's patents, CMC (Chemistry, Manufacturing, and Controls) information, drug substance and drug product stability, manufacturing process, specifications for drug substance and product, and regulatory correspondence, including Viking's latest Investigator's Brochure.  In reply, Chavez provided some information on Viking's patents and stated that the Investigator's Brochure in the secure data room was the most current version, but also explained, regarding the other requests, that Viking typically did not provide the sort of information requested by Gudmundsson absent a non-binding term sheet.

### 3.   Ascletis BioScience Withdraws

169.   After not hearing back from Ascletis BioScience on a possible term sheet, on April 10, 2019, and April 17, 2019, Viking followed up with Gudmundsson on "how much additional time [Ascletis BioScience] would expect for viewing documents during this stage of diligence."

170.   Four days after the second query, on April 21, 2019, Gudmundsson notified Viking that they "have decided not to move forward with licensing discussions."  According to Gudmundsson, this decision was "based on review of your intellectual property protection in China, which indicated lack of composition of matter protection for China."

171.   In response, Viking requested that, pursuant to Section 7 of the 2019 CDA, Ascletis BioScience destroy all tangible manifestations of Viking confidential information in its possession or control and permanently erase any

Viking confidential information from its electronic systems.  Viking also stated that Ascletis BioScience's access to Viking's secure data room had been removed.

172.   Gudmundsson then confirmed that Ascletis BioScience had "deleted all notes regarding Viking project" and "didn't have download access so no original documents."

### 4.   Defendants' Theft and Misappropriation

173.   After Ascletis BioScience withdrew from discussions with Viking on April 21, 2019, Jason Wu founded Gannex Pharma on September 3, 2019.  Ex. 5 at 123.

174.   Defendants' development of ASC41 began either before Defendants entered into the 2019 CDA with Viking or shortly thereafter.

175.   The first Ascletis Pharma annual report to mention ASC41 is its 2019 Annual Report.  This report, dated March 2020, states that the ASC41 "IND filing was accepted by NMPA on February 13, 2020."  Ex. 1 at 9.  It also states that ASC41 was allegedly developed "in-house."  Ex. 1 at 71.

176.   But as early as August 2018, Ascletis Pharma's Interim Report disclosed an unnamed NASH/Fatty Liver Disease drug that Ascletis Pharma was allegedly developing in-house, after it had already accessed Viking's confidential information and Viking Trade Secrets under the CDAs.  Ex. 15 at 5, Ascletis Pharma Inc., 2018 Interim Report.[14]

177.   None of the Defendants revealed to Viking at any point prior to or after execution of the CDAs, or while the Defendants were soliciting Viking Trade Secrets, that they were in development of or had developed a competing NASH/fatty liver disease drug.

178.   Ascletis Pharma's reports do not conclusively state that the drug identified in August 2018—before the 2019 CDA—was ASC41, but the reports are

---

[14] Exhibit 16 is the Chinese-language version of this report.

consistent with such a conclusion based on ASC41's progress over time and drug name numbering.

179.   Rather than exploring a legitimate business opportunity with Viking, which was the express purpose of the CDAs, Defendants purposely misled Viking into revealing Viking Trade Secrets on VK2809 to advance Defendants' secret development of a competing drug, ASC41.

### a.   Gannex Pharma Patents and Patent Applications

180.   After Ascletis BioScience withdrew from the 2019 CDA, Gannex Pharma filed Chinese patent applications and three U.S. patent applications for formulations and methods of synthesis for VK2809, one of which has issued as a U.S. patent.  It also filed an international patent application (Patent Cooperation Treaty) for a polymorph of VK2809.

181.   U.S. Patent Application 17/301,870 (the "'870 application," now published as U.S. Patent Application Publication No. US 2021/259977 A1) discloses a formulation comprising VK2809 and certain excipients.  Jinzi Jason Wu and Xuyu Chai of Shanghai, China, are listed as purported inventors.  Ex. 11. Gannex Pharma is listed as the Applicant.  The application claims an earliest possible priority date to Chinese application 202010105909.9 filed February 20, 2020.[15]

182.   Chinese application 202010105909.9 was filed approximately 11 months after the 2019 CDA and Viking granted Ascletis BioScience access to its secure data room, and approximately three years and seven months after the 2016 CDA.

---

[15] Exhibit 17 is Chinese applications 202010105909.9 and 202110194256.0, which are the two Chinese applications to which the '870 application claims priority. Chinese application 202110194256.0 contains essentially the same material as the '870 application.

183. The Investigator's Brochure discussed above was in Viking's secure data room, included a Confidentiality Statement, and was marked Confidential on every page.

184. Under the 2019 CDA, multiple individuals using "@ascletis.com" email addresses, including Musto and Gudmundsson, viewed the Investigator's Brochure in Viking's secure data room, including the specific page that lists the specific formulation that is a Viking Trade Secret.

185. Gannex Pharma's '870 patent application describes a formulation that is a Viking Trade Secret. Namely, the '870 patent application describes a formulation of VK2809 obtained from the secure data room. *See* Ex. 11 at 6.

186. Therefore, the '870 application improperly discloses the Viking Trade Secret specific formulation of VK2809 with certain excipients, including the specific ones shared in the secure data room.

187. Under the 2019 CDA, Musto and Gudmundsson also viewed the page of the Investigator's Brochure disclosing the techniques for storing certain formulations.

188. Gannex Pharma's '870 patent application improperly discloses certain Viking Trade Secret storage techniques, including specific parameters for storage shared in the secure data room. *Id.* at 5.

189. Under the 2016 CDA, Ascletis learned Viking Trade Secrets on manufacturing and preparing specific formulations.

190. Gannex Pharma's '870 patent application improperly discloses certain Viking Trade Secrets on manufacturing and preparing the specific VK2809 formulation shared under the 2016 CDA. Ex. 11 at 2.

191. U.S. Patent Application 17/212,623 (the "'623 application," now published as Publication No. U.S. Patent Application No. 2021-308155 A1) discloses several formulations. *See* Ex. 12 at 9. Jinzi Jason Wu and Xuyu Chai of Shanghai, China, are listed as purported inventors. Gannex Pharma is listed as the

Applicant.  The application claims an earliest possible priority date to Chinese application 2020102271770 filed March 27, 2020.[16]  Ex. 12.

192.   Chinese application 2020102271770 was filed approximately 12 months after the 2019 CDA and Viking granted Ascletis BioScience access to its secure data room, and approximately three years and seven months after the 2016 CDA.

193.   The Investigator's Brochure discussed above was in Viking's secure data room, included a Confidentiality Statement, and was marked Confidential on every page.

194.   Under the 2019 CDA, multiple individuals using "@ascletis.com" email addresses, including Musto and Gudmundsson, viewed the Investigator's Brochure in Viking's secure data room, including the specific page that lists the specific formulation that is a Viking Trade Secret.

195.   Gannex Pharma's '623 patent application describes a specific formulation that is a Viking Trade Secret.  Namely, the '623 patent application describes certain Viking Trade Secret formulations of VK2809 with certain excipients, including ones shared in the secure data room.  *See* Ex. 12 at 9.

196.   Therefore, the '623 application improperly discloses certain Viking Trade Secrets accessed in the secure data room.

197.   Under the 2019 CDA, Musto and Gudmundsson also viewed the page of the Investigator's Brochure disclosing certain Viking Trade Secret techniques for storing the specific VK2809 formulation.

198.   Gannex Pharma's '623 patent application improperly discloses certain Viking Trade Secret storage techniques, including Viking's specific parameters for storage shared in the secure data room.  *Id.*

---

[16] Exhibit 18 is Chinese application 202010227177.0, which is the Chinese application to which the '623 application claims priority.  The substance of Chinese application 202010227177.0 overlaps significantly with the '623 application.

199.   Under the 2016 CDA, Ascletis learned certain Viking Trade Secrets on manufacturing and preparing certain formulations.

200.   Gannex Pharma's '623 patent application improperly discloses certain Viking Trade Secrets on manufacturing and preparing formulations shared under the CDAs. *Id.*

201.   Under the CDAs, it is Viking's understanding that Ascletis obtained Viking Trade Secrets concerning the certain attributes of the formulations including stability and solubility of the formulations.

202.   Gannex Pharma's '623 patent application discloses a formulation and manufacturing and preparation of that formulation using a certain technique.  It is Viking's understanding Gannex Pharma improperly selected certain techniques by relying on the benefit of certain Viking Trade Secrets.  *See* Ex. 12 at 9.

### b.   Gannex Pharma's Corporate Presentation

203.   A corporate presentation posted to Gannex Pharma's public-facing website describes certain Viking Trade Secret storage techniques.  Ex. 19.

204.   Under the CDAs, Musto and Gudmundsson viewed the page of the Investigator's Brochure disclosing the Viking Trade Secret storage techniques.

205.   The Investigator's Brochure discussed above was in Viking's secure data room, included a Confidentiality Statement, and was marked Confidential on every page.

206.   The corporate presentation posted to Gannex Pharma's website therefore improperly discloses Viking's Trade Secret storage techniques.

### c.   ASC41 and Defendants' Clinical Trials

207.    After Ascletis BioScience ended discussions with Viking in April 2019, its sister and child companies, Ascletis Pharmaceuticals and Gannex Pharma, began clinical trials of ASC41 in August 2020.  Ex. 20.  For the reasons explained below, Viking understands that ASC41 is Ascletis's version of—if not the same compound as—VK2809.

208.   Viking describes VK2809 as a liver-targeted small molecule prodrug of a potent, selective TRβ agonist called VK2809A.  Ex. 21.  VK2809 is activated in the liver by cytochrome P450 isozyme 3A4 (abbreviated CYP3A4).  This activation removes part of the VK2809 molecule to produce VK2809A.  Ex. 21.

209.   Gannex Pharma has likewise publicly described ASC41 as a liver-targeted small molecule prodrug that is converted to its active metabolite, ASC41-A, a potent and selective TRβ agonist.  Ex. 19.  Gannex Pharma's publicly available materials show that ASC41 is converted to ASC41-A in the liver by CYP3A4.  Ex. 19.

210.   Gannex Pharma uses the same abbreviation scheme for the activated form of ASC41 used by Viking (*i.e.*, appending the letter "A" to the name of the activated drug following cleavage of the prodrug) and has used language to describe ASC41 that is nearly identical to the language used by Viking.  Ex. 19. And, like VK2809, ASC41 is described as a prodrug that is metabolized in the liver by CYP3A4 to produce a potent TRβ agonist.  Ex. 19.  Based on these facts and the additional evidence of misappropriation described herein, Viking infers that ASC41 is Ascletis's version of—if not the same compound as—VK2809.

211.   As explained below, the '623 patent application includes test results showing that ASC41-SM1, ASC41-SM2, and ASC41-A are impurities likely of ASC41.  This further implies that ASC41 is the same compound as VK2809.

212.   Gannex Pharma's '623 patent application, which names Gannex Pharma as the applicant and Jason Wu and Xuyu Chai as purported inventors, describes pharmaceutical compositions comprising "the compound of formula (I)." The '623 patent application identifies "the compound of formula (I)" by CAS No. 852948-13-1.  CAS No. 852948-13-1 is the same as the CAS No. of MB07811, which is VK2809.  Ex. 22.

213.   Ascletis Pharmaceuticals is listed in the U.S. Food and Drug Administration's systems as the manufacturer of, and entity that sent for import,

ASC41 tablets (~60 lbs.), with the date of import as October 2021. Ex. 23, Data from U.S. FDA Imports Data Search Database re: Ascletis; Ex. 24, Data from U.S. FDA Import Trade Auxiliary Communications System re: Ascletis Pharmaceuticals ASC41.

214.   Gannex Pharma is listed in the U.S. Food and Drug Administration's systems as the manufacturer of, and entity that sent for import, ASC41 tablets (1 carton), with the date of import as October 2021. Ex. 25, Data from U.S. FDA Imports Data Search Database re: Gannex Pharma; Ex. 26, Data from U.S. FDA Import Trade Auxiliary Communications System re: Gannex Pharma ASC41.

215.   Gannex Pharma is listed in the U.S. Food and Drug Administration's systems as the manufacturer of, and entity that sent for import, ASC43F tablets (~4.5 lbs.), with the date of import as November 2021. Ex. 25; Ex. 27, Data from U.S. FDA Import Trade Auxiliary Communications System re: Gannex Pharma ASC43F.

216.   The National Institute of Health's website for clinical trials (ClinicalTrials.gov) shows four completed phase 1 clinical trials for ASC41 sponsored by either Gannex Pharma or Ascletis Pharmaceuticals. Exs. 28–31. Three of these trials took place in China and one took place in San Antonio, Texas. *Id.* These trials began less than a year and a half after Ascletis BioScience viewed Viking Trade Secrets in Viking's secure data room in 2019. *Id.*

217.   ClinicalTrials.gov lists two phase 2 trials for ASC41. Exs. 32–33. Ascletis Pharma recently announced that the first patient was dosed in one of these phase 2 trials.[17]

218.   Based on the above misappropriation and factual allegations, Plaintiff understands that Defendants improperly used the Viking Trade Secrets to create the

---

[17] Ascletis Announces Dosing of the First Patient in Phase II Clinical Trial of THRβ Agonist ASC41 for 52-Week Treatment of Liver Biopsy-Proven NASH, Ascletis.com (Oct. 5, 2022), https://www.ascletis.com/news_detail/179/id/748.html.

ASC41 tablet formulation used in their ASC41 clinical trials, including those in the United States.  Among other acts, Defendants improperly used Viking's Trade Secrets on certain attributes of the specific formulation, including its stability and solubility, Viking's Trade Secret techniques for storing the specific VK2809 formulation, and pre-clinical and clinical trial information and data necessary for commercialization to develop the ASC41 tablet formulation used in these clinical trials.

219.   Defendants circumvented years of research and development by misappropriating Viking's trade secrets.  Defendants' breach of the CDAs and misappropriation enabled their development, testing, and commercialization (including clinical trials) of ASC41 in a rapidly abbreviated period of time.  The head start that Defendants obtained through misappropriation of trade secrets, breach of contract, and tortious acts caused and continues to cause irreparable injury, financial loss, and harm to Viking.

220.   Viking believes that discovery will reveal Defendants secretly used other Viking Trade Secrets, such as Viking's clinical trial protocols, to facilitate their development, testing, and clinical trials of ASC41.

221.   ClinicalTrials.gov also shows one completed phase 1 clinical trial (Clinical Trial No. NCT05118516) for ASC43F sponsored by Gannex Pharma in the United States.  Ex. 34.  ASC43F is a fixed-dose combination tablet of ASC41 and ASC42, a Farnesoid X Receptor (FXR) agonist currently being developed by Gannex Pharma.  Ex. 5 at 15.  This ASC43F phase 1 clinical trial began over a year after Ascletis BioScience viewed Viking's confidential information and Viking Trade Secrets in Viking's secure data room in 2019.

222.   On information and belief, Defendants improperly used at least the same Viking Trade Secrets that were misused in Defendants' efforts concerning ASC41 for the development, testing, and clinical trials of ASC43F.

223. But for Defendants' misappropriation of Viking Trade Secrets, they would not have readily developed the tablet formulation used in their ASC43F clinical trials, including in the United States.

224. Viking believes that discovery will reveal Defendants secretly used other Viking Trade Secrets, such as Viking's clinical trial protocols, to facilitate their development, testing, and clinical trials of ASC43F.

225. In light of these demonstrated instances of breach of contract, misappropriation, and other tortious acts, Viking anticipates that discovery will reveal additional acts of breach of contract, misappropriation, and other tortious acts in violation of state and federal laws.

226. As described above and below, in view of Defendants' improper disclosure and misuse of Viking Trade Secrets in patent applications, public presentations, and clinical trials and development of ASC41 and ASC43F, Viking can only infer that Defendants' competing products, ASC41 and ASC43F, were created, developed, derived, and imported into the United States with the benefit of, reliance on, and use of multiple Viking Trade Secrets.

### D.   Viking Secrecy Measures

227. During all relevant times, Viking took many steps to ensure the secrecy of its confidential information and Viking Trade Secrets.

228. Viking requires potential collaborators, such as Ascletis BioScience, to sign confidentiality disclosure agreements, like the CDAs.

229. Viking only discloses its confidential information, including Viking Trade Secrets, to others pursuant to confidential disclosure agreements in limited circumstances. As explained above for the CDAs, Viking's confidential disclosure agreements require others to maintain Viking's confidential information, including Viking Trade Secrets, in strict confidence and use such secret information only for the purpose identified in the confidential disclosure agreement. Viking's

confidential disclosure agreements contain measures to protect Viking Trade Secrets, such as those described above that are included in the CDAs.

230.   Viking requires third parties like contractors, consultants, suppliers, vendors, potential business collaborators, and anyone else that might need access to Viking confidential information, including Viking Trade Secrets, to sign agreements that obligate them to not disclose or use Viking's confidential information, including Viking Trade Secrets, for any purpose other than performing their jobs or duties.

231.   Viking likewise has corporate policies and guidelines to safeguard Viking Trade Secrets, such as a document retention policy, code of conduct and ethics, employee handbook, and social media policy.

232.   Viking requires its employees to sign agreements to maintain the confidentiality of Viking's confidential information, including Viking Trade Secrets.  These agreements require employees not to use any confidential information including trade secrets, except for the benefit of Viking to the extent necessary to perform obligations to Viking, and not to disclose to any person, firm, corporation or other entity, without written authorization from Viking in each instance.

233.   Viking's Code of Conduct and Ethics, for its employees, states that Viking's confidential information, including Viking Trade Secrets, is "[o]ne of our most important assets" and "may be protected by . . . trade secret laws."  The Code of Conduct and Ethics also states that Viking "strive[s] to outperform our competition fairly and honestly," and therefore Viking employees are prohibited from possessing trade secret information of others that was improperly obtained.  If such trade secret information of others is obtained by mistake, Viking employees must consult with their supervisor or Compliance Officer.

234.   Viking requires its employees to read and sign an Employee Handbook.  The Employee Handbook includes many provisions relating to the

secrecy of confidential information including Viking Trade Secrets:  employees may be disciplined or terminated for disclosing confidential information, including trade secrets, without authorization or misusing Viking property; protecting confidential information—including trade secrets—is of vital concern to Viking because it is one of the company's most important assets; failure to take reasonable measures to protect confidential information may jeopardize its status as a trade secret; employees may not use or disclose confidential information except as required to perform their jobs; misuse or unauthorized disclosure of confidential information may result in immediate termination and/or personal and criminal liability; confidential information transmitted via Viking's technology resources should be marked with messages of confidentiality; all Viking documents and tangible property must be returned immediately upon termination; Viking monitors employees' internet usage; employees must immediately report any loss of Viking equipment or suspicion that the security and confidentiality of Viking's data has been compromised.

235.   Viking requires that its employees agree to its Social Media Policy. The Social Media Policy forbids employees from disclosing Viking's confidential information, including Viking Trade Secrets on the internet.

236.   Viking obligates its biotechnology and pharmaceutical vendors, including those that perform preclinical laboratory services and clinical services, to hold Viking's confidential information including Viking Trade Secrets in confidence, use Viking's confidential information including Viking Trade Secrets only for the purposes described in the agreement, and disclose Viking's confidential information including Viking Trade Secrets only on a need-to-know basis to those bound by Viking confidentiality obligations.

237.   Viking takes steps to limit internal access to its confidential information including Viking Trade Secrets only on a need-to-know basis to those

bound by Viking confidentiality obligations, including with respect to shared folders like DropBox.

238.   Viking contracts with a third-party IT provider to ensure that its computer systems are secure.  The third-party IT provider provides a subscription-based package of services for an outsourced IT infrastructure.  Viking requires the third-party IT provider to take steps to keep Viking's confidential information, including Viking Trade Secrets, secure, including providing remote support, managing a security policy, installing monthly security patches, maintaining antivirus software, developing security policies for log retention, managing data disk encryption, employing security monitoring software, and performing cybersecurity training and phishing tests.

239.   With respect to the secure data rooms that hosted Viking Trade Secrets for Ascletis under the CDAs, Viking requires two-factor authentication to access the documents therein, and individuals that accessed documents therein using "@ascletis.com" email addresses were required to complete this two-factor authentication.

240.   Viking requires a physical keycard to enter its offices.  The keycard is provided to employees and its access is removed upon termination.

241.   It is Viking's understanding that Metabasis and Ligand also took reasonable measures to keep secret their trade secret information that eventually became Viking Trade Secrets.  In the license between Ligand/Metabasis and Viking, the know-how and other confidential and trade secret information exclusively licensed to Viking was "not in the public domain or otherwise publicly known."  The license also requires Ligand, Metabasis, and Viking to keep all licensed confidential information, including trade secrets, confidential and use it only as permitted by the license.

242.   Viking implemented and maintained the above measures to maintain the secrecy of the Viking Trade Secrets.

1

### E.   Value of Trade Secrets

2    243.   The Viking Trade Secrets derive independent economic value, actual

3    and potential, from not being generally known to, and not being readily

4    ascertainable through proper means by, others who can obtain economic value from

5    the disclosure or use of Viking Trade Secrets.

6    244.   "NASH is a growing epidemic in the U.S. and is quickly becoming a

7    leading cause of cirrhosis and liver failure.  It is estimated that NASH affects 2% to

8    5% of Americans."[18]  Currently, there are no therapies approved by the FDA for the

9    treatment of NASH.  This contributes to the value of the Viking Trade Secrets.

10   245.   VK2809 is Viking's leading clinical program.  Viking believes the

11   Viking Trade Secrets concerning VK2809 represents a substantially valuable.

12   246.   As described above, Viking paid Ligand and Metabasis a substantial

13   licensing fee for the Viking Trade Secrets.  Viking also agreed in the license to

14   make future royalty and milestone payments.

15   247.   The Viking Trade Secrets are the result of valuable research and

16   development, time, effort, and investment.

17   248.   Disregarding the substantial investment of Metabasis to the

18   development of VK2809, Viking's independent expenditures for VK2809 are

19   significant.  Viking anticipates substantial revenues should VK2809 obtain final

20   FDA approval and Defendants are equitably enjoined from commercializing their

21   competing drug that was unlawfully derived from and use Viking's Trade Secrets.

22   249.   The Viking Trade Secrets would be valuable to competitors because

23   they, among other benefits, demonstrate various proofs of concept, steer

24   competitors away from paths that are not fruitful, and speed research and

25   development, such as by shortening the amount of time needed to experimentally

26   determine a functional formulation.

27

28   [18] https://www.vikingtherapeutics.com/pipeline/metabolic-disease-program/.

250.   The specific formulation that is a Viking Trade Secret is valuable because creating any new, safe formulation for a drug generally requires an investment of time and money to develop and test and the ability to avoid spending that time and money is valuable.  Saving time provides an additional benefit of increasing the chance of being the first to market and reaping first-mover advantages.  Defendants improperly obtained all of these benefits.

251.   Knowledge of certain Viking Trade Secrets also allowed Defendants to improperly disseminate certain of them publicly, such as via the above described Gannex Pharma patent applications, which effectively destroyed the value of certain Viking Trade Secrets disclosed and forever revealed therein.

**F.     Viking Trade Secrets Are Not Generally Known or Readily Ascertainable**

252.   Viking has never disclosed the Viking Trade Secrets to third parties without appropriate protectionary measures in place to maintain secrecy, such as through a confidentiality agreement.

253.   Viking has never published, disseminated, or otherwise made generally known the Viking Trade Secrets.

254.   Outside certain of the Defendants' improper acts as described herein, the Viking Trade Secrets are not generally known to other persons who could obtain economic value from their disclosure or use.

255.   Outside certain of the Defendants' improper acts as described herein, the Viking Trade Secrets are not readily ascertainable through proper means by other persons who could obtain economic value from the disclosure or use.

**IV.   Claims for Relief**

**A.     Misappropriation of Trade Secrets under Defend Trade Secrets Act (18 U.S.C. § 1836(b))**

**(All Defendants)**

- 49 -

256.   Viking repeats, incorporates, and re-alleges the above allegations as if fully set forth herein.

257.   Viking owned or exclusively licensed, possessed, and continues to own or exclusively license and possess, at least the Viking Trade Secrets described above.  Viking is the entity in which rightful legal or equitable title to, or exclusive license in, the Viking Trade Secrets is reposed.

258.   As described above, the Viking Trade Secrets consist of at least business, scientific, technical, and engineering information.

259.   The Viking Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the Viking Trade Secrets.

260.   Viking provided substantial consideration for, and/or expended significant time and money developing, the Viking Trade Secrets.

261.   Viking took reasonable measures to maintain the secrecy of the Viking Trade Secrets.

262.   As explained above, it is Viking's understanding that Metabasis and Ligand also took reasonable measures to keep secret their trade secret information that became Viking Trade Secrets.

263.   The Viking Trade Secrets are related to a product and service used in, and intended for use in, interstate and foreign commerce.  Namely, the Viking Trade Secrets relate to designing, preparing, manufacturing, and commercializing VK2809 that Viking intends to sell throughout the United States and abroad.

264.   Each Defendant misappropriated Viking Trade Secrets, causing Viking substantial irreparable harm and financial damage.  The entity Defendants misappropriated Viking Trade Secrets both directly and vicariously, including via respondeat superior.

265.   The Defendants also collectively conspired, acted in concert, acted as each other's agents, and aided, abetted, and ratified each others' actions, to successfully misappropriate, convert, and improperly exploit the Viking Trade Secrets, causing Viking substantial irreparable harm and financial damage.

266.   The Defendants further hid their improper conduct from Viking, including by spreading different acts of misappropriation between different company family members, such that Viking was unaware of Defendants' individual and collective acts of misappropriation.

267.   Defendants conducted the improper acts described herein without Viking's consent.

268.   Defendants' scheme to misappropriate Viking Trade Secrets started with the acts of Ascletis Bioscience and its founder Jason Wu, who directs and controls the corporate Defendants, including on their prior and ongoing misappropriation of Viking Trade Secrets.

269.   Ascletis Bioscience acquired Viking Trade Secrets while knowing and having reason to know that its acquisition of the Viking Trade Secrets was improper.

270.   After Ascletis BioScience obtained Viking Trade Secrets, including by viewing them in Viking's secure data room, it thereafter improperly kept those Viking Trade Secrets for later misuse by itself and the other Defendants in violation of duties and obligations under the CDAs.

271.   Ascletis BioScience knew that its retention of Viking Trade Secrets was improper because doing so breached multiple duties and obligations in the CDAs.

272.   After Ascletis BioScience terminated the 2019 CDA, it was contractually required to promptly return the Viking Trade Secrets to Viking, without retaining any copies thereof, and permanently erase any Viking Trade Secrets in electronic form from its electronic systems.

273.   Instead of returning and erasing the Viking Trade Secrets after termination of the CDAs, Ascletis BioScience improperly and secretly retained Viking Trade Secrets for the Defendants' later misuse and exploitation.

274.   Furthermore, Ascletis BioScience represented to Viking that it had destroyed all copies of data and had no notes or downloads of any Viking Trade Secrets which was, on information and belief, knowingly false.

275.   After Ascletis Bioscience improperly retained the Viking Trade Secrets, it then improperly disclosed and improperly used the Viking Trade Secrets without Viking's express or implied consent.

276.   Ascletis BioScience promised in the CDAs to use the Viking Trade Secrets only for the purpose of engaging in discussions regarding exploration of a business opportunity or transaction of mutual interest with Viking.

277.   Ascletis BioScience intentionally ignored and broke its promise in the CDAs, choosing instead to secretly misuse and disseminate among the Defendants Viking Trade Secrets for its own and the other Defendants' improper gain and benefit.

278.   Ascletis BioScience also improperly disclosed and used the Viking Trade Secrets without Viking's consent, in violation of the CDAs, by at least providing them to Gannex Pharma, who at Jason Wu's direction, in turn, improperly published certain of them in patent applications and on Gannex Pharma's website.  Gannex Pharma also used the Viking Trade Secrets provided by Ascletis BioScience or other Defendants to pursue clinical trials of ASC41 in the United States and China.

279.   Ascletis BioScience also improperly disclosed and used the Viking Trade Secrets by disclosing them to Ascletis Pharmaceuticals, who, in turn, commercially exploited the Viking Trade Secrets as described above, including in connection with its development of ASC41.  Ascletis Pharmaceuticals also used the

1 Viking Trade Secrets provided by Ascletis BioScience or other Defendants to
2 pursue clinical trials of ASC41 in the United States and China.

3    280.   On information and belief, discovery will reveal that Ascletis
4 BioScience and/or Jason Wu improperly disclosed additional Viking Trade Secrets
5 to Ascletis BioScience's other sister, child, and parent companies.

6    281.   At the time of Ascletis BioScience's improper acquisition, disclosures,
7 and misuses of the Viking Trade Secrets, Ascletis BioScience knew and had reason
8 to know that the Viking Trade Secrets were derived from or through persons,
9 including its employees, agents, and officers, who had used improper means to
10 acquire the Viking Trade Secrets, including under a duty to maintain the secrecy of
11 the Viking Trade Secrets and limit the use of the Viking Trade Secrets as promised
12 under the CDAs.  For example, as the signatory to, and entity bound by, the CDAs,
13 Ascletis BioScience, including through its then Vice President and Director, Judy
14 Wu, knew of the restrictions placed on it by the CDAs regarding use of Viking
15 Trade Secrets.

16    282.   Gannex Pharma improperly acquired the Viking Trade Secrets from
17 Ascletis BioScience, Jason Wu, or other Defendants while knowing and having
18 ample reason to know that the Viking Trade Secrets were acquired by improper
19 means.

20    283.   Gannex Pharma knew or had reason to know that it was acquiring the
21 Viking Trade Secrets by improper means because Gannex Pharma and Ascletis
22 BioScience are controlled and run by the same owner, Jason Wu, and have
23 overlapping personnel and business operations

24    284.    Gannex Pharma used improper means when acquiring, disclosing, and
25 misusing Viking Trade Secrets without Viking's express or implied consent.

26    285.   Gannex Pharma disclosed certain Viking Trade Secrets without
27 Viking's consent by at least publishing them in patent applications, publishing them

28

on Gannex Pharma's website, and, on information and belief, disclosing them to other Defendants.

286.   Gannex Pharma used certain Viking Trade Secrets without Viking's consent to obtain a patent, pursue patent applications, and facilitate its own clinical trials and the clinical trials of its sister company, Ascletis Pharmaceuticals.

287.   Gannex Pharma's misappropriation allowed it, Ascletis Pharmaceuticals, and the other Defendants to circumvent years of research and development, thereby rapidly launching ASC41 (including ASC41 formulations) over an incredibly abbreviated period of time.

288.   For the same reasons as above, Gannex Pharma disclosed and used the Viking Trade Secrets without Viking's express or implied consent and at the time of disclosure or use knew and had reason to know that the knowledge of the Viking Trade Secrets was derived from or through a person who had used improper means to acquire the Viking Trade Secrets, acquired under circumstances giving rise to a duty to maintain the secrecy of the Viking Trade Secrets or limit the use of the Viking Trade Secrets, or derived from or through a person who owed a duty to Viking to maintain the secrecy of the Viking Trade Secrets or limit the use of the Viking Trade Secrets.  For example, as the sister company to Ascletis BioScience, which had signed the CDAs, and as the company sharing an owner and personnel with Ascletis BioScience, Gannex Pharma knew of the restrictions placed on Ascletis BioScience by the CDAs regarding use of Viking Trade Secrets.

289.   Ascletis Pharmaceuticals improperly acquired the Viking Trade Secrets from Ascletis BioScience, Jason Wu, or other Defendants while knowing and having ample reason to know that the Viking Trade Secrets were acquired by improper means.

290.   Ascletis Pharmaceuticals knew or had reason to know that it was acquiring the Viking Trade Secrets by improper means because Ascletis

Pharmaceuticals and Ascletis BioScience are controlled and run by the same owner, Jason Wu, and have overlapping personnel and business operations.

291.   Ascletis Pharmaceuticals used improper means when acquiring, disclosing, and misusing Viking Trade Secrets without Viking's express or implied consent.

292.   Ascletis Pharmaceuticals used the Viking Trade Secrets without Viking's consent to facilitate its own clinical trials and the clinical trials of its sister company, Gannex Pharma.

293.   Ascletis Pharmaceuticals' misappropriation allowed it, Gannex Pharma, and the other Defendants to circumvent years of research and development, thereby rapidly launching ASC41 (including ASC41 formulations) over an incredibly abbreviated period of time.

294.   For the same reasons as above, Ascletis Pharmaceuticals disclosed certain and used certain of the Viking Trade Secrets without Viking's express or implied consent and at the time of disclosure or use knew and had reason to know that the knowledge of the Viking Trade Secrets was derived from or through a person who had used improper means to acquire the Viking Trade Secrets, acquired under circumstances giving rise to a duty to maintain the secrecy of the Viking Trade Secrets or limit the use of the Viking Trade Secrets, or derived from or through a person who owed a duty to Viking to maintain the secrecy of the Viking Trade Secrets or limit the use of the Viking Trade Secrets.  For example, as the child company to Ascletis BioScience, which had signed the CDAs, and as the company sharing an owner and personnel with Ascletis BioScience, Ascletis Pharmaceuticals knew of the restrictions placed on Ascletis BioScience by the CDAs regarding use of Viking Trade Secrets.

295.   Ascletis Pharma is the global company parent of Defendants and alter ego of Jason Wu, and thereby directed the conspiracy and scheme to successfully misappropriate Viking Trade Secrets.  Ascletis Pharma also misappropriated Viking

Trade Secrets for at least the same reasons as Ascletis BioScience, Gannex Pharma, and Ascletis Pharmaceuticals because, given the overlapping roles held by individuals among Ascletis Pharma and its subsidiaries, the actions taken by one of the wholly owned subsidiaries was taken by and on behalf of Ascletis Pharma.

296.   Jason Wu orchestrated the company structure of Defendants, controlled and directed Defendants' actions (including on their conspiracy and scheme to successfully misappropriate Viking Trade Secrets) and improperly named himself on patents containing Viking Trade Secrets.

297.   Jason Wu is liable for misappropriation of the Viking Trade Secrets for at least the same reasons as Ascletis BioScience, Gannex Pharma, Ascletis Pharmaceuticals, and Ascletis Pharma because Jason Wu directed the misappropriation acts of the Defendants.  Jason Wu was a direct participant in, he controlled, and he provided significant direction and authorization of the efforts of the Defendants that misappropriated the Viking Trade Secrets.  Jason Wu is the majority shareholder of the parent company Defendant that wholly owns the subsidiary Defendants, he is the CEO of each company, and he is listed as a purported inventor on the patent applications that disclose Viking Trade Secrets.

298.   Defendants are liable for misappropriation of the Viking Trade Secrets as alter egos of each other, as single enterprises with each other, as agents of each other, and/or by aiding, abetting, and ratifying the actions of each other.

299.   The short period of time (after obtaining access to Viking Trade Secrets) over which Defendants allegedly developed the Viking Trade Secret information in their patent applications and proceeded to clinical trials on ASC41 belies any claim that Defendants independently developed Viking Trade Secrets.

300.   Viking expects that discovery will reveal additional specific acts of misappropriation, including those by unknown entities and persons who improperly acquired through Defendants, and improperly used or disclosed, additional Viking Trade Secrets.

301. Given the close ties between the Defendant companies—such as them sharing a common parent company, Jason Wu's leadership roles in each of them, overlapping employees, and them operating in the same industry—and the evidence of malicious acts, it is likely that the Defendant companies did not maintain strict boundaries between each other, and may have attempted to use their separate corporate structures to insulate certain companies from claims of wrongdoing against their related companies.

302. Defendants' misappropriation of the Viking Trade Secrets is ongoing. Defendants continue to conduct clinical trials with the intent of commercializing their misappropriated ASC41 product, through which Defendants utilize the Viking Trade Secrets.

303. Defendants have at least partially destroyed the value of certain Viking Trade Secrets that they already disclosed to the public, and either destroyed or diminished the value of other Viking Trade Secrets that they improperly disseminated and misused.

304. Further misappropriation of the Viking Trade Secrets is threatened. Defendants have filed an Investigational New Drug application ("IND") in the Unites States for ASC41. The FDA approved this IND, allowing Defendants to conduct clinical trials in the Unites States with ASC41. Viking expects that Defendants plan to use these clinical trials to support a New Drug Application ("NDA") to seek approval to market ASC41 for the treatment of NASH and NAFLD in the United States.

305. If allowed to continue, Defendants' current and future misappropriation of Viking Trade Secrets will have a severe negative impact on Viking's business and opportunities to recoup its substantial investment in VK2809.

306. As a direct and proximate result of Defendants' conduct as alleged herein, Viking has suffered significant damages in an amount to be proven at trial

but which exceeds hundreds of millions of dollars.  Such damages are measured through actual loss and/or unjust enrichment.  The full extent of harm caused by Defendants' misappropriation is not known or knowable at this time.

307.   Viking has lost certain valuable Viking Trade Secrets that have now been made public by Defendants.  If Defendants' misappropriation is allowed to continue, Viking expects that its valuation will decrease because its valuable information has been improperly taken, used, and disclosed by Defendants to create and commercialize a competing drug.

308.   Defendants' actions have caused Viking to lose control of certain Viking Trade Secrets, and they have devalued Viking Trade Secrets by making them available to Viking's competitors.

309.   Viking has also lost its competitive advantage over Defendants and other competitors, including the first-mover advantage.  Instead, Defendants have made progress faster than they otherwise would have while avoiding expending the time and resources that Viking expended.

310.   Defendants' misappropriation of the Viking Trade Secrets was willful and malicious, entitling Viking to recover exemplary damages and its attorneys' fees and costs.  With the information that they gleaned through their access to Viking's Trade Secrets (which Viking thought at the time was in furtherance of a legitimate business collaboration), Defendants, among other improper acts, copied Viking's specific VK2809 formulation, claimed it as their own, and extinguished its confidential and secret status through public disclosure.

311.   If Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to Viking's detriment the Viking Trade Secrets.

312.   Because Viking's remedy at law is inadequate, Viking seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information, the fruits of Viking's

confidential, proprietary, and trade secret information, and other legitimate business interests.  Injunctive relief is necessary to eliminate the commercial advantage that otherwise would be derived from Defendants' continued misappropriation of the Viking Trade Secrets.

313.   Pursuant to 18 U.S.C. § 1836, Viking also seeks injunctive relief to prevent the threatened misappropriation of the Viking Trade Secrets and unknown additional Viking trade secrets that may be revealed through this Action.

**B.     Misappropriation of Trade Secrets under California Uniform Trade Secrets Act (California Civil Code § 3426, *et seq.*) (All Defendants)**

314.   Viking repeats, incorporates, and re-alleges the above allegations as if fully set forth herein.

315.   Viking owned or exclusively licensed, possessed, and continues to own or exclusively license and possess, at least the Viking Trade Secrets described above.  Viking is the entity in which rightful legal or equitable title to, or exclusive license in, the Viking Trade Secrets is reposed.

316.   As described above, the Viking Trade Secrets consist of at least business, scientific, technical, and engineering information.

317.   The Viking Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the Viking Trade Secrets.

318.   Viking provided substantial consideration for, and/or expended significant time and money developing, the Viking Trade Secrets.

319.   Viking took reasonable measures to maintain the secrecy of the Viking Trade Secrets.

320.   As explained above, it is Viking's understanding that Metabasis and Ligand also took reasonable measures to keep secret their trade secret information that became Viking Trade Secrets.

321.   Each Defendant misappropriated Viking Trade Secrets, causing Viking substantial irreparable harm and financial damage.  The entity Defendants misappropriated Viking Trade Secrets both directly and vicariously, including via respondeat superior.

322.   The Defendants also collectively conspired, acted in concert, acted as each other's agents, and aided, abetted, and ratified each others' actions, to successfully misappropriate, convert, and improperly exploit the Viking Trade Secrets, causing Viking substantial irreparable harm and financial damage.

323.   The Defendants further hid their improper conduct from Viking, including by spreading different acts of misappropriation between different company family members, such that Viking was unaware of Defendants' individual and collective acts of misappropriation.

324.   Defendants conducted the improper acts described herein without Viking's consent.

325.   Defendants' scheme to misappropriate Viking Trade Secrets started with the acts of Ascletis Bioscience and its founder Jason Wu, who directs and controls the corporate Defendants, including on their prior and ongoing misappropriation of Viking Trade Secrets.

326.   Ascletis Bioscience acquired Viking Trade Secrets while knowing and having reason to know that its acquisition of the Viking Trade Secrets was improper.

327.   After Ascletis BioScience obtained Viking Trade Secrets, including by viewing them in Viking's secure data room, it thereafter improperly kept those Viking Trade Secrets for later misuse by itself and the other Defendants in violation of duties and obligations under the CDAs.

328.   Ascletis BioScience knew that its retention of Viking Trade Secrets was improper because doing so breached multiple duties and obligations in the CDAs.

329.   After Ascletis BioScience terminated the 2019 CDA, it was contractually required to promptly return the Viking Trade Secrets to Viking, without retaining any copies thereof, and permanently erase any Viking Trade Secrets in electronic form from its electronic systems.

330.   Instead of returning and erasing the Viking Trade Secrets after termination of the CDAs, Ascletis BioScience improperly and secretly retained Viking Trade Secrets for the Defendants' later misuse and exploitation.

331.   Furthermore, Ascletis BioScience represented to Viking that it had destroyed all copies of data and had no notes or downloads of any Viking Trade Secrets which was, on information and belief, knowingly false.

332.   After Ascletis Bioscience improperly retained the Viking Trade Secrets, it then improperly disclosed certain and improperly used certain of the Viking Trade Secrets without Viking's express or implied consent.

333.   Ascletis BioScience promised in the CDAs to use the Viking Trade Secrets only for the purpose of engaging in discussions regarding exploration of a business opportunity or transaction of mutual interest with Viking.

334.   Ascletis BioScience intentionally ignored and broke its promise in the CDAs, choosing instead to secretly misuse and disseminate among the Defendants Viking Trade Secrets for its own and the other Defendants' improper gain and benefit.

335.   Ascletis BioScience also improperly disclosed certain and used certain of the Viking Trade Secrets without Viking's consent, in violation of the CDAs, by at least providing them to Gannex Pharma, who at Jason Wu's direction, in turn, improperly published certain Viking Trade Secrets in patent applications and on Gannex Pharma's website.  Gannex Pharma also used the Viking Trade Secrets

provided by Ascletis BioScience or other Defendants to pursue clinical trials of ASC41 in the United States and China.

336.   Ascletis BioScience also improperly disclosed certain and used certain of the Viking Trade Secrets by disclosing them to Ascletis Pharmaceuticals, who, in turn, commercially exploited the Viking Trade Secrets as described above, including in connection with its development of ASC41.  Ascletis Pharmaceuticals also used the Viking Trade Secrets provided by Ascletis BioScience or other Defendants to pursue clinical trials of ASC41 in the United States and China.

337.   On information and belief, discovery will reveal that Ascletis BioScience and/or Jason Wu improperly disclosed additional Viking Trade Secrets to Ascletis BioScience's other sister, child, and parent companies.

338.   At the time of Ascletis BioScience's improper acquisition, disclosures, and misuses of the Viking Trade Secrets, Ascletis BioScience knew and had reason to know that the Viking Trade Secrets were derived from or through persons, including its employees, agents, and officers, who had used improper means to acquire the Viking Trade Secrets, including under a duty to maintain the secrecy of the Viking Trade Secrets and limit the use of the Viking Trade Secrets as promised under the CDAs.  For example, as the signatory to, and entity bound by, the CDAs, Ascletis BioScience, including through its then Vice President and Director, Judy Wu, knew of the restrictions placed on it by the CDAs regarding use of Viking Trade Secrets.

339.   Gannex Pharma improperly acquired the Viking Trade Secrets from Ascletis BioScience, Jason Wu, or other Defendants while knowing and having ample reason to know that the Viking Trade Secrets were acquired by improper means.

340.   Gannex Pharma knew or had reason to know that it was acquiring the Viking Trade Secrets by improper means because Gannex Pharma and Ascletis

BioScience are controlled and run by the same owner, Jason Wu, and have overlapping personnel and business operations.

341.   Gannex Pharma used improper means when acquiring, disclosing, and misusing Viking Trade Secrets without Viking's express or implied consent.

342.   Gannex Pharma disclosed certain Viking Trade Secrets without Viking's consent by at least publishing them in patent applications, publishing them on Gannex Pharma's website, and, on information and belief, disclosing them to other Defendants.

343.   Gannex Pharma used certain Viking Trade Secrets without Viking's consent to obtain a patent, pursue patent applications, and facilitate its own clinical trials and the clinical trials of its sister company, Ascletis Pharmaceuticals.

344.   Gannex Pharma's misappropriation allowed it, Ascletis Pharmaceuticals, and the other Defendants to circumvent years of research and development, thereby rapidly launching ASC41 (including ASC41 formulations) over an incredibly abbreviated period of time.

345.   For the same reasons as above, Gannex Pharma disclosed and used certain Viking Trade Secrets without Viking's express or implied consent and at the time of disclosure or use knew and had reason to know that the knowledge of the Viking Trade Secrets was derived from or through a person who had used improper means to acquire the Viking Trade Secrets, acquired under circumstances giving rise to a duty to maintain the secrecy of the Viking Trade Secrets or limit the use of the Viking Trade Secrets, or derived from or through a person who owed a duty to Viking to maintain the secrecy of the Viking Trade Secrets or limit the use of the Viking Trade Secrets.  For example, as the sister company to Ascletis BioScience, which had signed the CDAs, and as the company sharing an owner and personnel with Ascletis BioScience, Gannex Pharma knew of the restrictions placed on Ascletis BioScience by the CDAs regarding use of Viking Trade Secrets.

346.   Ascletis Pharmaceuticals improperly acquired the Viking Trade Secrets from Ascletis BioScience, Jason Wu, or other Defendants while knowing and having ample reason to know that the Viking Trade Secrets were acquired by improper means.

347.   Ascletis Pharmaceuticals knew or had reason to know that it was acquiring the Viking Trade Secrets by improper means because Ascletis Pharmaceuticals and Ascletis BioScience are controlled and run by the same owner, Jason Wu, and have overlapping personnel and business operations

348.   Ascletis Pharmaceuticals used improper means when acquiring, disclosing, and misusing Viking Trade Secrets without Viking's express or implied consent.

349.   Ascletis Pharmaceuticals used certain Viking Trade Secrets without Viking's consent to facilitate its own clinical trials and the clinical trials of its sister company, Gannex Pharma.

350.   Ascletis Pharmaceuticals' misappropriation allowed it, Gannex Pharma, and the other Defendants to circumvent years of research and development, thereby rapidly launching ASC41 (including ASC41 formulations) over an incredibly abbreviated period of time.

351.   For the same reasons as above, Ascletis Pharmaceuticals disclosed certain and used certain of the Viking Trade Secrets without Viking's express or implied consent and at the time of disclosure or use knew and had reason to know that the knowledge of the Viking Trade Secrets was derived from or through a person who had used improper means to acquire the Viking Trade Secrets, acquired under circumstances giving rise to a duty to maintain the secrecy of the Viking Trade Secrets or limit the use of the Viking Trade Secrets, or derived from or through a person who owed a duty to Viking to maintain the secrecy of the Viking Trade Secrets or limit the use of the Viking Trade Secrets.  For example, as the child company to Ascletis BioScience, which had signed the CDAs, and as the

company sharing an owner and personnel with Ascletis BioScience, Ascletis Pharmaceuticals knew of the restrictions placed on Ascletis BioScience by the CDAs regarding use of Viking Trade Secrets.

352.   Ascletis Pharma is the global company parent of Defendants and alter ego of Jason Wu, and thereby directed the conspiracy and scheme to successfully misappropriate Viking Trade Secrets.  Ascletis Pharma also misappropriated Viking Trade Secrets for at least the same reasons as Ascletis BioScience, Gannex Pharma, and Ascletis Pharmaceuticals because, given the overlapping roles held by individuals among Ascletis Pharma and its subsidiaries, the actions taken by one of the wholly owned subsidiaries was taken by and on behalf of Ascletis Pharma.

353.   Jason Wu orchestrated the company structure of Defendants, controlled and directed Defendants' actions (including on their conspiracy and scheme to successfully misappropriate Viking Trade Secrets) and improperly named himself on patents containing Viking Trade Secrets.

354.   Jason Wu is liable for misappropriation of the Viking Trade Secrets for at least the same reasons as Ascletis BioScience, Gannex Pharma, Ascletis Pharmaceuticals, and Ascletis Pharma because Jason Wu directed the misappropriation acts of the Defendants.  Jason Wu was a direct participant in, he controlled, and he provided significant direction and authorization of the efforts of the Defendants that misappropriated the Viking Trade Secrets.  Jason Wu is the majority shareholder of the parent company Defendant that wholly owns the subsidiary Defendants, he is the CEO of each company, and he is listed as a purported inventor on the patent applications that disclose Viking Trade Secrets.

355.   Defendants are liable for misappropriation of the Viking Trade Secrets as alter egos of each other, as single enterprises with each other, as agents of each other, and by aiding, abetting, and ratifying the actions of each other.

356.   The short period of time (after obtaining access to Viking Trade Secrets) over which Defendants allegedly developed the Viking Trade Secret

information in their patent applications and proceeded to clinical trials on ASC41 belies any claim that Defendants independently developed Viking Trade Secrets.

357.   Viking expects that discovery will reveal additional specific acts of misappropriation, including those by unknown entities and persons who improperly acquired through Defendants, and improperly used or disclosed, additional Viking Trade Secrets.

358.   Given the close ties between the Defendant companies—such as them sharing a common parent company, Jason Wu's leadership roles in each of them, overlapping employees, and them operating in the same industry—and the evidence of malicious acts, it is likely that the Defendant companies did not maintain strict boundaries between each other, and may have attempted to use their separate corporate structures to insulate certain companies from claims of wrongdoing against their related companies.

359.   Defendants' misappropriation of the Viking Trade Secrets is ongoing. Defendants continue to conduct clinical trials with the intent of commercializing their misappropriated ASC41 product, through which Defendants utilize the Viking Trade Secrets.

360.   Defendants have at least partially destroyed the value of certain Viking Trade Secrets that they already disclosed to the public, and either destroyed or diminished the value of other Viking Trade Secrets that they improperly disseminated and misused.

361.   Further misappropriation of the Viking Trade Secrets is threatened. Defendants have filed an Investigational New Drug application ("IND") in the Unites States for ASC41.  The FDA approved this IND, allowing Defendants to conduct clinical trials in the Unites States with ASC41.  Viking expects that Defendants plan to use these clinical trials to support a New Drug Application ("NDA") to seek approval to market ASC41 for the treatment of NASH in the United States.

362.   If allowed to continue, Defendants' current and future misappropriation of Viking Trade Secrets will have a severe negative impact on Viking's business and opportunities to recoup its investment in VK2809.

363.   As a direct and proximate result of Defendants' conduct as alleged herein, Viking has suffered significant damages in an amount to be proven at trial but which exceeds hundreds of millions of dollars.  Such damages are measured through actual loss and/or unjust enrichment.  The full extent of harm caused by Defendants' misappropriation is not known or knowable at this time.

364.   Viking has lost certain valuable Viking Trade Secrets that have now been made public by Defendants.  If Defendants' misappropriation is allowed to continue, Viking expects that its valuation will decrease because its valuable information has been improperly taken, used, and disclosed by Defendants to create and commercialize a competing drug.

365.   Defendants' actions have caused Viking to lose control of certain Viking Trade Secrets, and they have devalued Viking Trade Secrets by making them available to Viking's competitors.

366.   Viking has also lost its competitive advantage over Defendants and other competitors, including a possible first-mover advantage.  Instead, Defendants have made progress faster than they otherwise would have while avoiding expending the time and resources that Viking expended.

367.   Defendants' misappropriation of the Viking Trade Secrets was willful and malicious, entitling Viking to recover exemplary damages and its attorneys' fees and costs.  With the information that they gleaned through their access to Viking's Trade Secrets (which Viking thought at the time was in furtherance of a legitimate business collaboration), Defendants, among other improper acts, copied Viking's formulation, claimed it as their own, and extinguished certain of its confidential and secret status through public disclosure.

368.   If Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to Viking's detriment the Viking Trade Secrets.

369.   Because Viking's remedy at law is inadequate, Viking seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information, the fruits of Viking's confidential, proprietary, and trade secret information, and other legitimate business interests.  Injunctive relief is necessary to eliminate the commercial advantage that otherwise would be derived from Defendants' continued misappropriation of the Viking Trade Secrets.

370.   Pursuant to Cal. Civil Code § 3426.2(a), Viking also seeks injunctive relief to prevent the threatened misappropriation of the Viking Trade Secrets and unknown additional Viking trade secrets that may be revealed through this Action.

### C.     Breach of Contract
### (All Defendants)

371.   Viking repeats, incorporates, and re-alleges the above allegations as if fully set forth herein.

372.   All conditions precedent to bringing this claim have occurred or been performed.

373.   The CDAs are valid, binding, and enforceable contracts between Viking and Ascletis BioScience.  In other words, both parties were capable of contracting, both parties consented, the contract had a lawful object, and there was sufficient cause or consideration.

374.   Viking performed all of its obligations under the CDAs.

375.   Section 2.B of the CDAs obligates Ascletis BioScience to "maintain such Confidential Information in strict confidence, using efforts at least as protective as those employed by the Receiving Party for the protection of its own proprietary information of like nature."

376.   Ascletis BioScience breached section 2.B of the CDAs by sharing Viking's confidential information, including certain Viking Trade Secrets, with at least Gannex Pharma, demonstrating that Ascletis BioScience did not keep the confidential information in strict confidence.  At least the Viking Trade Secrets discussed above are Viking confidential information, which is covered by the CDAs.

377.   Section 2.B of the CDAs obligates Ascletis BioScience to "use such Confidential Information only as required for the Purpose."  Ascletis BioScience breached this provision of the CDAs by sharing Viking's confidential information, including certain Viking Trade Secrets, with at least Gannex Pharma for a reason other than the CDAs' Purpose, namely, so that Gannex Pharma could use the confidential information for its own benefit.  In light of the common leadership and ownership between these two sister companies, a benefit to Gannex Pharma is likewise a benefit to Ascletis BioScience.

378.   Section 2.B of the CDAs obligates Ascletis BioScience to "not disclose or permit the disclosure of such Confidential Information to any persons other than to its directors, officers, or employees (collectively 'Personnel') who need to know such Confidential Information for the Purpose and who are bound by written obligations of non-disclosure and non-use of such Confidential Information which are at least as stringent as those set forth herein."  Ascletis BioScience breached this provision of the CDAs by at least disclosing Viking's confidential information, including certain Viking Trade Secrets, via the Gannex Pharma patent and patent applications and disclosing it to Gannex Pharma personnel (as opposed to its own directors, officers, or employees).  In light of the common leadership and ownership between these two sister companies, a benefit to Gannex Pharma is likewise a benefit to Ascletis BioScience.

379.   Section 2.B of the CDAs obligates Ascletis BioScience to "reproduce Confidential Information only to the extent necessary for the Purpose, with all such

reproductions being marked and treated as Confidential Information." Ascletis BioScience breached this provision of the CDAs by at least reproducing Viking's confidential information, including certain Viking Trade Secrets, in the Gannex Pharma patent and patent applications and, on information and belief, reproducing it in digital or paper form to convey it to Gannex Pharma or in furtherance of Gannex Pharma prosecuting its patent applications. In light of the common leadership and ownership between these two sister companies, a benefit to Gannex Pharma is likewise a benefit to Ascletis BioScience. At least the Viking Trade Secrets discussed above are Viking confidential information, which is covered by the CDAs.

380.   Section 3 of the CDAs obligates Ascletis BioScience to "not (i) create or develop any derivative works, discoveries, or improvements . . . using, incorporating, or derived from any Confidential Information of the Disclosing Party ('New Disclosing Party IP')." Ascletis BioScience breached this provision of the CDAs by at least creating or developing ASC41, by itself and through its sister and child companies, using Viking's confidential information, including certain Viking Trade Secrets.

381.   Section 3 of the CDAs obligates Ascletis BioScience to "not . . . (ii) make, have made, use or sell any product or provide any service, using, incorporating, or derived from any Confidential Information of the Disclosing Party ('New Disclosing Party IP')." Ascletis BioScience breached this provision of the CDAs by at least making ASC41 using Viking's confidential information, including certain Viking Trade Secrets.

382.   Section 3 of the CDAs states: "In the event the Receiving Party does create or develop any New Disclosing Party IP, the Receiving Party shall promptly disclose such New Disclosing Party IP to the Disclosing Party." Ascletis BioScience breached this provision at least by developing ASC41 by itself and through its sister and child companies and not disclosing it to Viking. In light of

1   the common leadership and ownership between the sister and child companies, a

2   benefit to the sister and child companies is likewise a benefit to Ascletis

3   BioScience.

4       383.    Section 4 of the CDAs obligates Ascletis BioScience "not to file any

5   patent application(s) disclosing or claiming Confidential Information of the

6   Disclosing Party."  Ascletis BioScience breached this provision at least by filing

7   patent applications through Gannex Pharma disclosing Viking confidential

8   information, including certain Viking Trade Secrets.  In light of the common

9   leadership and ownership between these two sister companies, a benefit to Gannex

10  Pharma is likewise a benefit to Ascletis BioScience.

11      384.    Section 7 of the CDAs states: "Upon the termination of discussions

12  between the Parties or at any time upon the written request of the Disclosing Party,

13  the Receiving Party shall promptly return to the Disclosing Party, or, upon the

14  Disclosing Party's request destroy, all originals, copies, analyses, evaluations,

15  extracts and summaries of documents, materials, and other tangible manifestations

16  of Confidential Information of the Disclosing Party in the possession or control of

17  the Receiving Party, without retaining copies thereof.  In addition, the Receiving

18  Party shall permanently erase any Confidential Information of the Disclosing Party

19  in electronic form from its electronic systems.  At the Disclosing Party's request,

20  the Receiving Party shall certify in writing its compliance with the requirements of

21  this Section 7."  Ascletis BioScience breached this provision by failing to return all

22  tangible manifestations of Viking's confidential information, including Viking

23  Trade Secrets, in its possession or control, without retaining copies thereof, after the

24  parties terminated discussions, and failing to permanently erase any of Viking's

25  confidential information, including Viking Trade Secrets, in electronic form from

26  its electronic systems.  Viking understands this to have occurred because, as

27  discussed above, Ascletis BioScience used Viking's confidential information,

28  including Viking Trade Secrets, months after the parties terminated discussions.

385.   Ascletis BioScience breached the CDAs both directly and vicariously, including via respondeat superior.

386.   At least the Viking Trade Secrets discussed above are Viking confidential information, which is covered by the CDAs.  Ascletis BioScience's multiple acts of misappropriation of Viking Trade Secrets, as described above, are therefore each a material breach of the CDAs.

387.   As a direct, foreseeable, and proximate result of the breaches of the CDAs by Ascletis BioScience, Viking has been and/or will be damaged in that it will lose revenue that it would have received but for the breaches of the CDAs, and Viking has suffered or will suffer harm due to the breaches.

388.   For example, Viking has lost the ability to profit from exclusive use of certain Viking Trade Secrets that have now been made public by Defendants.  Viking expects that its valuation may decrease because its valuable information has been taken, used, and disclosed by a competitor to create a competing drug.

389.   In addition, as a direct, foreseeable, and proximate result of the breaches of the CDAs, Ascletis BioScience has been unjustly enriched.

390.   Regarding remedies, the parties agreed to the following in the CDAs: "Each Receiving Party recognizes and agrees that the unauthorized use or disclosure of the Disclosing Party's Confidential Information could cause irreparable injury to the Disclosing Party and that that money damages may not be a sufficient remedy for any breach of this Agreement.  Accordingly, each Receiving Party agrees that the Disclosing Party shall be entitled as a remedy for any such breach, in addition to any other remedies and damages available to the Disclosing Party, to injunctive relief (without necessity of posting or filing a bond or any other security) to restrain violation hereof by the Receiving Party or its Personnel.  Such remedy shall be in addition to any and all other remedies available at law or in equity.  In addition, any assignments under Sections 3 or 4 of this Agreement shall

not be deemed an exclusive remedy for breach of such Sections but shall be in addition to any other remedies available to the Disclosing Party at law or in equity."

391. As a direct, foreseeable, and proximate result of the breach of the CDAs, Viking has suffered and will continue to suffer irreparable injury.

392. Because Viking's remedy at law is inadequate, Viking seeks, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information, the fruits of Viking's confidential, proprietary, and trade secret information, and Viking's other legitimate business interests. Viking will continue suffering irreparable harm absent injunctive relief.

393. All Defendants are also liable for breach of contract for the same reasons as Ascletis BioScience, both directly and vicariously, including via respondeat superior, because the relationships among Defendants indicate that even when individuals purported to act on behalf of Ascletis BioScience, they were in fact acting on behalf of other Defendants.

394. Given the close ties between the Defendant companies—such as them sharing a common parent company, Jason Wu's leadership roles in each of them, overlapping employees, and all operating in the same industry—and the evidence of malicious acts, the Defendant companies did not maintain strict boundaries between each other, and may have attempted to use their separate corporate structures to insulate certain companies from claims of breach against their related companies.

395. All Defendants are liable for breach of contract as alter egos of each other, as single enterprises with each other, as agents of each other, and by aiding, abetting, and ratifying the actions of each other.

**D.    Breach of Implied Covenant of Good Faith and Fair Dealing (Ascletis BioScience)**

396. Viking repeats, incorporates, and re-alleges the above allegations as if fully set forth herein.

397. Ascletis BioScience entered into contracts (the CDAs) with Viking.

398.   The CDAs contain an implied covenant of good faith and fair dealing.

399.   Viking did all, or substantially all, of the significant things that the contract required Viking to do.

400.   All conditions required for Ascletis BioScience's performance had occurred.

401.   Ascletis BioScience's conduct prevented Viking from receiving the benefits of the CDAs.  In other words, Ascletis BioScience frustrated Viking's rights to benefit from the CDAs.

402.   For example, Ascletis BioScience either entered the CDAs knowing that it intended to frustrate Viking's ability to receive the benefits of the CDAs, or decided shortly after entering the CDAs that it would take actions to frustrate Viking's ability to receive the benefits of the CDAs, including by not disclosing to Viking the New Disclosing Party IP, not returning both Viking confidential information and Viking Trade Secrets, and by sharing both Viking confidential information and Viking Trade Secrets with Ascletis BioScience's sister, child, and parent companies, or allowing its sister, child, and parent companies to access the Viking Trade Secrets.

403.   On information and belief, Ascletis BioScience intended to let its sister, child, and parent companies use, disclose, and benefit from both Viking confidential information and Viking Trade Secrets in an attempt to circumvent the provisions and purpose of the CDAs, which was only purportedly entered into by Ascletis BioScience.

404.   Ascletis BioScience's use of sister, child, and parent companies to use and disclose both Viking confidential information and Viking Trade Secrets— which the sister, child, and parent companies were only able to access due to Ascletis BioScience entering into the CDAs with Viking—constitutes conduct that violated the implied covenant of good faith and fair dealing by preventing Viking

from receiving the benefits of the CDAs, to the extent these actions did not also breach the CDAs.

405.   By doing so, Ascletis BioScience did not act fairly and in good faith.

406.   Ascletis BioScience breached the implied covenant of good faith and fair dealing both directly and vicariously, including via respondeat superior.

407.   Viking was harmed by Ascletis BioScience's conduct.

408.   This breach of the implied covenant of good faith and fair dealing has caused, and will continue to cause, Viking to suffer substantial monetary damages in an amount to be determined at trial, as well as monetary damages that cannot be calculated, and irreparable harm to its reputation and goodwill.

409.   As a direct, foreseeable, and proximate result of the breach of the implied covenant of good faith and fair dealing by Ascletis BioScience, Viking has suffered and will continue to suffer irreparable injury.

410.   Because Viking's remedy at law is inadequate, Viking seeks, in addition to damages, injunctive relief to recover and protect its rights to benefit from the CDAs.  Viking will continue suffering irreparable harm absent injunctive relief.

**E.   Tortious Interference with Contract**
**(Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, Jason Wu)**

411.   Viking repeats, incorporates, and re-alleges the above allegations as if fully set forth herein.

412.   To the extent that Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu did not breach the CDAs, then, in the alternative, Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu tortiously interfered with the CDAs between Viking and Ascletis BioScience.

413.   Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu knew of the CDAs between Viking and Ascletis BioScience.  Gannex Pharma,

Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu knew or had reason to know of the contracts at least because Jason Wu is the founder and CEO of both Ascletis BioScience and Gannex Pharma, Ascletis Pharmaceuticals, and Ascletis Pharma and because Jason Wu accessed Viking's secure data room under the CDAs.

414.   Gannex Pharma also knew or had reason to know of the CDAs at least because Kristjan Gudmundsson and Joseph Musto, who were employees of Ascletis BioScience at the time of the CDAs and accessed the secure data room under the CDAs, were named executives of Gannex Pharma after its formation.

415.   Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu also knew or had reason to know of the CDAs at least because Judy Hejingdao Wu, the spouse of Jason Wu, who herself held roles at Ascletis Pharma and Ascletis BioScience, signed at least the 2019 CDA on behalf of Ascletis BioScience.

416.   When Gannex Pharma filed United States and foreign patent applications that included certain Viking Trade Secrets, Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu knew that these patent applications would publish.  Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu knew that the filing and publication of patent applications containing certain Viking Trade Secrets would prevent Ascletis BioScience from complying with its promises and obligations of confidentiality and restricted use of Viking Trade Secrets under the CDAs.

417.   When Ascletis Pharma and Gannex Pharma included on its public website certain Viking Trade Secrets for storage, Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu knew that this website material would be available for others throughout the world to inspect, copy, and archive. Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu knew that this website material containing certain Viking Trade Secrets would prevent

Ascletis BioScience from complying with its promises and obligations of confidentiality and restricted use of Viking Trade Secrets under the CDAs.

418.   Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu also knew that the filing and publication of patent applications and posting on Ascletis Pharma and Gannex Pharma's website materials containing certain Viking Trade Secrets would prevent Ascletis BioScience from complying with its promises and obligations to "not (i) create or develop any derivative works, discoveries, or improvements . . . using, incorporating, or derived from any Confidential Information of the Disclosing Party ('New Disclosing Party IP')."

419.   Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu further knew that the filing and publication of patent applications and posting on Ascletis Pharma and Gannex Pharma's website materials containing certain Viking Trade Secrets would prevent Ascletis BioScience from complying with its promises and obligations to "promptly disclose such New Disclosing Party IP to the Disclosing Party" if Ascletis BioScience created or developed any New Disclosing Party IP.  Additionally, on information and belief, Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu induced and instructed Ascletis BioScience to not comply with its promises and obligations to "promptly disclose such New Disclosing Party IP to the Disclosing Party" and not to return to Viking both Viking confidential information and Viking Trade Secrets.

420.   Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu further knew that the filing and publication of patent applications and posting on Ascletis Pharma and Gannex Pharma's website materials containing certain Viking Trade Secrets would prevent Ascletis BioScience from complying with its promises and obligations to "not to file any patent application(s) disclosing or claiming Confidential Information of the Disclosing Party."

421.   Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu further knew that the filing and publication of patent applications and posting

on Ascletis Pharma and Gannex Pharma's website materials containing certain Viking Trade Secrets would prevent Ascletis BioScience from complying with its promises and obligations to destroy all confidential information of Viking upon termination of the CDAs.

422.   Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu tortiously interfered with the CDAs between Viking and Ascletis BioScience both directly and vicariously, including via respondeat superior.

423.   Viking was harmed as a result Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu filing United States and foreign patent applications and posting on Ascletis Pharma and Gannex Pharma's website materials that included certain Viking Trade Secrets.  The filing and publication of these United States and foreign patent applications made public certain Viking Trade Secrets and Viking confidential information.

424.   Viking seeks damages as a result of Gannex Pharma filing United States and foreign patent applications and posting on Ascletis Pharma and Gannex Pharma's website materials that included certain Viking Trade Secrets and Viking's confidential information and the resulting breach of Ascletis BioScience's contractual obligations to Viking.

425.   On information and belief, discovery will reveal that Gannex Pharma, Ascletis Pharmaceuticals, Ascletis Pharma, and Jason Wu tortiously interfered with the CDAs in other respects.

**V.   Prayer for Relief**

WHEREFORE, Viking respectfully requests that the Court enter judgment in favor of Viking and against Defendants and grant relief as follows:

1.     Judgment for Viking and against Defendants on all counts;

2.     Actual damages in an amount to be proven at trial;

3.     Restitution, actual loss, unjust enrichment, and disgorgement of profits;

1        4.      Alternatively, a reasonable royalty;

2        5.      An order declaring that Viking is the owner of all right, title, and interest in all derivative works, discoveries, or improvements, or any product or service, including New Disclosing Party IP, using, incorporating, or derived from any Viking confidential information, including Viking Trade Secrets.  In the alternative, an order requiring Defendants to take all actions necessary to establish Viking's ownership of all derivative works, discoveries, or improvements, or any product or service, including New Disclosing Party IP, using, incorporating, or derived from any Viking confidential information, including Viking Trade Secrets. Further in the alternative, an order requiring specific performance under the CDAs of Defendants' contractual obligations to assign all right, title, and interest in all derivative works, discoveries, or improvements, or any product or service, including New Disclosing Party IP, using, incorporating, or derived from any Viking confidential information, including Viking Trade Secrets;

6.      An order declaring that Viking is the owner of all right, title, and interest in all patent applications, patents, and New Disclosing Party IP, that disclose, claim, rely on, or derive from Viking confidential information, including Viking Trade Secrets.  In the alternative, an order requiring Defendants to take all actions necessary to establish Viking's ownership in all patent applications, patents, and New Disclosing Party IP that disclose, claim, rely on, or derive from Viking confidential information, including Viking Trade Secrets.  Further in the alternative, an order requiring specific performance under the CDAs of Defendants' contractual obligations to assign all right, title, and interest in all patent applications, patents, and New Disclosing Party IP that disclose, claim, rely on, or derive from Viking confidential information, including Viking Trade Secrets;

7.      An order requiring Defendants to take all reasonable efforts to prosecute and maintain any patents, patent applications, and New Disclosing Party IP that will ultimately be transferred to Viking;

8.      An order restraining and permanently enjoining Defendants from further using and disclosing the Viking Trade Secrets;

9.      A permanent injunction:  (i) prohibiting Defendants and those in concert with them from researching, developing, commercializing, monetizing, conducting or directing any business and clinical trials, and pursuing intellectual property concerning drugs and formulations that are found to have been copied, used, derived from, created or developed in whole or in part or whose creation or development has been aided or enhanced by reason of the acts complained of herein; (ii) prohibiting Defendants and those in concert with them from using, accessing, disclosing, or continuing to possess Viking confidential information, including Viking Trade Secrets, and information derived therefrom; (iii) prohibiting Defendants and those in concert with them from using, accessing, disclosing or continuing to possess information copied or derived from Viking confidential information, including Viking Trade Secrets; (iv) ordering the return or destruction under the supervision of a court-appointed forensic expert at Defendants' expense of Viking confidential information, including Viking Trade Secrets, and information copied or derived therefrom; (v) ordering a forensic evaluation at Defendants' expense confirming that Defendants have returned or properly destroyed all of Viking's confidential information, including Viking Trade Secrets, described herein and are not using it, including as part of its ASC41 development and commercialization, and a forensic report at Defendants' expense to determine whether the information has been shared and with whom; and (vi) requiring any future development work under true "clean room" conditions with required auditing to ensure compliance;

10.     Imposition of a constructive trust over Viking confidential information, including Viking Trade Secrets, and all innovations derived therefrom, of which Viking is the beneficiary;

11.    An immediate order requiring Defendants and their employees, agents, officers, affiliates, and other unknown conspirators to preserve and not destroy all evidence, including documents and communications, whether electronic or paper, relevant to the allegations in this Complaint;

12.    Viking's reasonable attorneys' fees;

13.    Viking's reasonable costs;

14.    Exemplary damages in accordance with 18 U.S.C. § 1836(b)(3)(C), or other exemplary or punitive damages;

15.    Pre-judgment and post-judgment interest;

16.    All other relief at law or in equity;

17.    Any other relief that the Court deems proper.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand trial by jury in this action on all claims and issues so triable.

1    DATED:  December 29, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

PAUL HASTINGS LLP


By:  s/ Christopher H. McGrath
Christopher H. McGrath (CA 149129)
chrismcgrath@paulhastings.com
4747 Executive Drive, 12th Floor
San Diego, CA 92121
Telephone: 858-458-3000

Bruce M. Wexler (NY 2529030)
(to be admitted *pro hac vice*)
brucewexler@paulhastings.com
Eric W. Dittmann (NY 3974540)
(to be admitted *pro hac vice*)
ericdittmann@paulhastings.com
Amanda E. Hoffman (NY 5587365)
(to be admitted *pro hac vice*)
amandahoffman@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: 212-318-6000

Jeff A. Pade (DC 492030)
(to be admitted *pro hac vice*)
jeffpade@paulhastings.com
Kecia J. Reynolds (DC 975573)
(to be admitted *pro hac vice*)
keciareynolds@paulhastings.com
Richard E. Rothman (DC 1616717)
(to be admitted *pro hac vice*)
richardrothman@paulhastings.com
Brandon Howell (VA 95826)
(to be admitted *pro hac vice*)
brandonhowell@paulhastings.com
2050 M Street NW
Washington, DC 20036
Telephone: 202-551-1700

Attorneys for Plaintiff
Viking Therapeutics, Inc.

- 82 -